UNITED STATES of America,
Plaintiff-Appellee,

v.

Gary John CROSBY,
Defendant-Appellant.

No. 82–3604.

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1983.
Certiorari Denied Nov. 28, 1983.
See 104 S.Ct. 506.

Virginia Laughlin Schlueter, Federal Public Defender, Julian R. Murray, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., New Orleans, La., Harry W. McSherry, Jr., Curtis L. Collier, Asst. U.S. Attys., for plaintiff-appellee.

Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

On Sunday morning, January 31, 1982, Gary John Crosby came to the home of his friend, Dominick Nuccio, and borrowed a shotgun from Nuccio's young son, ostensibly to go hunting. Approximately thirty minutes to an hour later, Crosby drove to the Veterans Administration (VA) Hospital in New Orleans. He parked his automobile and walked around the hospital to the main entrance, leaving his shotgun in the car. Once inside the building, Crosby walked through the main lobby and past the emergency room nurse's station, and then exited the building to the ambulance parking area where he had left his car. Minutes later Crosby reentered the hospital, this time with his shotgun. He walked directly into the emergency room nurses station where two VA nurses, George Sharman and Mildred Moore, and two doctors, Charles Rich-ard and Bung Mui, were working. Jess Porter, a patient, and his daughter, Patricia, were in an adjacent room. Crosby brandished the shotgun and began using profane language, generally voicing his dissatisfaction with the Veterans Administration and the way it had treated him. Attempts by the doctors to calm Crosby failed, but within fifteen minutes all the victims were released except for nurse George Sharman. For the next two to three hours Crosby held Sharman in the room with the shotgun, forcing Sharman to lock all the doors and cover all the windows in the room. After approximately three hours of negotiation, officers of the New Orleans Police Department were successful in persuading Crosby to release his hostage and surrender. No one was physically harmed in the incident.

█ Crosby was indicted on federal charges of kidnapping, in violation of 18 U.S.C. § 1201(a)(2), and four counts of assault with intent to commit a felony, in violation of 18 U.S.C. § 113(b).[1] At trial, Crosby did not contest that he committed the acts with which he was charged, but alleged that he was suffering from Post-Traumatic Stress Disorder (PTSD) at the time of the incident, as a result of his experiences in combat in Vietnam.[2] A psychiatrist for the government who examined Crosby shortly after the events testified that he was of the opinion that Crosby could appreciate the wrongfulness of his conduct, and that he detected nothing in his examination to indicate that Crosby was suffering from PTSD. Rather, he felt that Crosby's problems were the result of an "anti-social" personality and a serious drug problem. The psychiatrist who observed Crosby during his examination at the United States Medical Center for federal prisoners in Springfield, Missouri, confirmed this opinion. Two psychiatrists testifying in behalf of Crosby said that Crosby was experiencing a dissociative reaction caused by

---

**1.** Count one alleged the kidnapping of George Sharman. Counts two, three, four and five alleged assaults upon Dr. Charles Richard, Dr. Bung Mui, Mildred Moore, and Patricia Gayle Porter, with intent to kidnap Sharman.

**2.** The Diagnostic and Statistical Manual, 3rd Edition, of the American Psychiatric Association recognizes the existence of the Post-Traumatic Stress Disorder as a mental disorder.

PTSD and was therefore not criminally responsible for his conduct.[3]

At the conclusion of a seven day trial, the jury returned a verdict of guilty on the kidnapping charge, and found Crosby guilty of the lesser included offense of assault with a dangerous weapon on Counts Two, Three, Four and Five. Crosby was sentenced to ten years on the kidnapping charge, to five year concurrent sentences on Counts Two, Three, and Four, and to a five year sentence on Count Five. The five year sentences were suspended on the condition that he be placed on probation for that period upon his release from confinement after serving his ten year sentence for the kidnapping conviction.

Crosby now appeals, claiming (1) that the evidence was insufficient to support his conviction for kidnapping under 18 U.S.C. § 1201(a)(2); (2) that the district court abused its discretion in excluding admission of his notes and journal at trial; (3) that the district court abused its discretion in excluding records maintained by a veteran's counseling center; (4) that the district court abused its discretion in allowing the government to impeach a defense witness as to a statement allegedly made by the witness to another party who was never called to testify; (5) that the district court abused its discretion in excluding hostage negotiation statements of a New Orleans police officer; (6) that the district court abused its discretion in refusing to qualify a witness for the defense as an expert; (7) that his trial was in violation of the Speedy Trial Act and the Sixth Amendment; and (8) that the charges against him were multiplicitous. Following review of the record, we conclude that Cros-

by's claims are without merit, and affirm his conviction on all counts.

## I. Sufficiency of the Evidence

■ Crosby first challenges the sufficiency of the evidence to support his conviction of kidnapping under 18 U.S.C. § 1201(a)(2).[4] Under that statute, the three elements necessary for conviction are (1) knowing and willful kidnapping, (2) an intent to gain a benefit from that seizure, and (3) the kidnapping took place within the special maritime and territorial jurisdiction of the United States. *Hattaway v. United States,* 399 F.2d 431, 433 (5th Cir.1968). Crosby does not contest that he held Sharman against his will at gunpoint within a locale under the special jurisdiction of the United States. He does, however, argue that the evidence was insufficient to support a finding that Sharman was held, "for ransom or reward or otherwise". Specifically, Crosby argues that the kidnapping was for no purpose at all, and therefore, the conviction cannot stand.

■ As originally enacted, the Federal Kidnapping Act only prohibited seizure and detention "for ransom or reward". 47 Stat. 326 (1932). However, this language was soon amended to read "for ransom or reward *or otherwise*". 48 Stat. 781 (1934) (emphasis added). In *Gooch v. United States,* 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522 (1936), the Supreme Court determined that the addition of this phrase indicated a congressional intent that the statute be given a broad application. *Id.* at 128, 56 S.Ct. at 397. Such an expansive interpretation has been uniformly adhered to by the federal courts, and it is clear that the statute does not require a motive of pecuniary prof-

---

**3.** Under the law, a person is not responsible for criminal conduct if "at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Blake v. United States,* 407 F.2d 908, 916 (5th Cir. 1969). A defendant may suffer from a mental disorder and yet still be deemed legally responsible for his crime. *United States v. Collins,* 690 F.2d 431, 434 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983).

**4.** 18 U.S.C. § 1201 provides in relevant part:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; shall be punished by imprisonment for any term of years or for life.

it. *United States v. Healey,* 376 U.S. 75, 81, 84 S.Ct. 553, 557, 11 L.Ed.2d 527 (1964); *United States v. Wolford,* 444 F.2d 876, 881 (D.C.Cir.1971). As explained by the District of Columbia Circuit, "[w]e think that Congress by the phrase 'or otherwise' intended to include any object of the kidnapping which the perpetrator might consider of sufficient benefit to himself to induce him to undertake it." *Wolford, supra,* 444 F.2d at 881, *quoting United States v. Parker,* 103 F.2d 857, 861 (3d Cir.1939), *cert. denied,* 307 U.S. 642, 59 S.Ct. 1044, 83 L.Ed. 1522 (1939).

■ The "benefit" to Crosby alleged by the government in this case was that he held his victim "for the purpose of influencing the actions of the Veterans Administration." Crosby concedes that this non-pecuniary motive would support a conviction. In determining whether the evidence is sufficient to establish this motive, we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We reverse only if a reasonably minded jury must necessarily have entertained a reasonable doubt as to the existence of the essential elements of the crime. *United States v. Davis,* 666 F.2d 195, 201 (5th Cir.1982); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Crosby's contention that he expected nothing from the kidnapping is belied by the record. Robin Lamotte, an administrative assistant at the VA Hospital, testified that she heard Crosby say that he was "tired of being treated" the way he had been treated by the VA and that he "couldn't take it anymore." Dr. Mui testified that Crosby said he was "fed up" with the system and wanted to "voice his complaints about the system." Dr. Richard testified that Crosby said the "VA Hospital was not helping him and the doctors were not helping him. No one cared about what

happened to him." Patricia Porter testified that Crosby told her and her father that he did not mean to hurt them, and that "his beef was with the VA." She also said that Crosby told her the VA Hospital did not care about him or any of the men who had come back from Vietnam, and that his purpose in being there was to make the VA treat him the way he should have been treated originally. Porter also overheard Crosby making a telephone call to his wife during which Crosby said he was "fed up with the VA, with the VA hospital."

■ We are convinced that the evidence presented in this case permitted a reasonable jury to conclude that Crosby entered the Veterans Administration Hospital and held his hostage at bay with the expectation of some benefit. There is sufficient evidence in the record to support Crosby's conviction on this charge.

## II. *Evidentiary Rulings*

### A. Exclusion of Crosby's Prior Writings and Statements

During the course of trial, Crosby attempted to introduce into evidence various out-of-court writings and oral statements. These statements included a purported "journal" compiled by Crosby between 1972 and 1982, as well as other poetry and writings Crosby alleged illustrated the mental problems he suffered as a result of his experience in Vietnam. Crosby offered these materials in evidence under Fed.R. Evid. 801(d)(1)(B), which allows admission of a prior statement of the witness if offered to rebut an express or implied charge of recent fabrication.[5]

Crosby claims that the trial court's exclusion of these materials was reversible error because they would have supported his contention that he had been suffering from the effects of PTSD for several years prior to the incident at the VA Hospital. The

---

5. Crosby theorized that the materials offered would be admissible under Fed.R.Evid. 801(d)(1)(B) because the prosecutor had earlier questioned Crosby concerning books dealing with PTSD given to him by the counselors at the Veterans Outreach Center. The implication of such questioning, Crosby contends, was that he had fabricated his defense after learning characteristics of PTSD from the pamphlets. The government denied any attempt to charge Crosby with fabrication.

government contends that the statements were merely a selected compilation of prose writings and poetry which could not purport to be an accurate, chronological recitation of past events. Additionally, the writings were incomplete, were perhaps affected by Crosby's admitted drug and alcohol problems, and were cumulative of other testimony. As such, they were properly excluded under Rule 403 of the Federal Rules of Evidence.[6]

A trial court has broad discretion regarding the admission of cumulative statements. This discretion to exclude "is particularly appropriate when dealing with essentially cumulative evidence . . . or for evidence adding only a minor 'incremental probity'", *United States v. Mock*, 640 F.2d 629, 632 (5th Cir.1981), *quoting United States v. Beechum*, 582 F.2d 898, 914 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

A review of the record reveals that Crosby's wife, who had read the journals, testified in detail about their contents, as well as about the problems Crosby had suffered since he returned from Vietnam. Crosby's own expert witness, Dr. C.W. Scrignar, also had reviewed the writings and referred to them repeatedly during his testimony. Scrignar stated that the writings were one of the most "important" bases for his conclusion that Crosby was indeed suffering from PTSD at the time of the Veterans Administration incident and therefore not responsible for his actions. Crosby's mother, brother, friends, and Crosby himself described complaints of sleeplessness and nightmares and the changes in Crosby's personality which had occurred subsequent to his return from Vietnam. It is clear that whatever probative value the writings may have had was established by the testimony of other witnesses. More-

over, the statements were convoluted and voluminous, their reliability questionable, and it was not established that they consisted of all such documents. Under these conditions, the district court's decision to exclude this evidence was proper and certainly not an abuse of the court's discretion.[7]

### B. Veterans Outreach Center Records

Crosby next challenges the trial court's refusal to allow the introduction in evidence of certain records created and maintained by the Veterans Outreach Center (Vet Center), a storefront counseling service which works closely with Vietnam veterans under the auspices of the Veterans Administration. Crosby sought admission of the records under Rule 803(6) of the Federal Rules of Evidence which allows admission of records compiled as a function of a regularly conducted business activity. The government objected on the grounds that the material contained opinions about PTSD which the Vet Center counselors, who had no training in psychiatry, were unqualified to give. Crosby complains that exclusion of this evidence was "unfair" in light of the fact that the court did allow admission of medical records compiled at the Veterans Administration Hospital.

We uphold the court's refusal to admit the records. First, this evidence was essentially cumulative of other testimony. Two counselors who had seen Crosby during his sessions at the Vet Center from June, 1981 to early January, 1982 testified in detail concerning those meetings. Each explained that Crosby had seemed very agitated and upset, that he complained of having violent nightmares, and that he felt he could not relate to his family and friends. Each also testified that Crosby appeared on the verge

---

**6.** Federal Rule of Evidence 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**7.** Crosby also attempted to have the writings admitted under Fed.R.Evid. 803(3) which al-

lows admission of statements that would otherwise be hearsay if a statement of the declarant's "then existing state of mind, emotion, sensation, or physical condition." Because the writings were composed over a ten year period, there can be little question that they in no way related to Crosby's "then existing" mental state, and would therefore not be admissible under the hearsay exception allowed by Rule 803(3).

of crying when Vietnam was mentioned, and that Crosby was reluctant to talk about his experiences there. Most significant, each of the counselors repeatedly referred to the disputed Vet Center records to refresh his memory during his testimony. It is clear that the counselors' testimony adequately corroborated the complaints which were contained in the disputed records.

Moreover, we fail to see how exclusion of this evidence, even if erroneous, would have prejudiced the defendant. Crosby contends that the excluded material relates to his having suffered bad dreams and flashbacks as early as 1971, thus supporting his contention that he was a PTSD victim for some time prior to the events at the VA Hospital. However, testimony of Crosby's brother, mother, wife and friends had already established that Crosby had been suffering from these symptoms, as well as others, for many years prior to 1981. The substance of the records was presented through the testimony of the Vet Center Counselors, and whatever benefit the records might have had with respect to Crosby's defense had already been established by the testimony of other defense witnesses. The court's refusal to allow their admission was properly within its discretion.

### C. Hostage Negotiation Tape Recording

During the final stages of the kidnapping incident, a New Orleans police officer acting as negotiator allegedly represented to Crosby that he would not be jailed if he gave himself up and released his hostage. The exchange between Crosby and the officer was contained in a tape recording of the hostage negotiations. The government filed a motion in limine to exclude as evidence this portion of the tape recorded exchange because the statements to the officer were ambiguous and would result in undue jury sympathy for the defendant. The defense objected to the motion on the ground that its reading of Rule 106 of the Federal Rules of Evidence establishes a mandate that a tape recording must be introduced in its entirety if it is introduced

at all.[8] The trial court granted the government's motion in limine to bar introduction of this portion of the recording.

The government argues that the trial court did not take the position that the defense could *never* play the disputed portion of the tape. Rather, the government claims that the court made clear that the defense could play that portion of the tape any time it could show that the contested portion was relevant. Crosby disputes this, and insists that no such ruling was made. Our reading of the record convinces us that the government's position is correct. At the stage of the trial in which the government was questioning a police officer who was involved in the hostage negotiations and it became apparent that the tape would be played, the defense approached the bench and requested that the court rule on "first of all, the ten minutes in controversy, and whether the tape has to be played in its entirety." The court replied that

[t]he ten minutes may not be admissible. There is no way we can know, but certainly the government is not presenting some selective kind of tape. They haven't selected portions and excluded others. I think that the tape, as we have it, as we find it, is admissible, excluding the ten minutes. I remain unconvinced about the last portion *until such time as you show its relevance.* You certainly may, on cross examination, play any part of the rest of the tape."

The defense persisted in its objection, explaining that "even deleting the portion that talks about any type of bargain, the government has still selected and excerpted out a number of parts and put in other parts, and that is what they are going to play right now."

It is clear from this exchange that the court's reference to "the ten minutes" related to that portion of the tape which contained the police officer's alleged promise to Crosby that he would not be prosecuted if he gave himself up. More discussion be-

---

**8.** Rule 106 provides as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

tween the attorneys and the court followed, at which point the defense conceded that "if we follow that procedure, I don't really see how we can be hurt too much. It does look like a waste to everybody's time, but if we can come right behind him and play the whole thing—" The court replied "You certainly can, with the exception of . . ." Defense counsel completed the sentence by saying "the part on the bargain. Yes, I understand the court's ruling on that." Before cross examining the government witness, the defense again asked for clarification as to which portions of the tape the court would allow it to play. The court explained that the defense could play "whatever you want to play." When the defense asked the court whether its statement extended to "the language regarding the bargain", the court replied that this portion could not, at this time, be admitted, but that "I also say that if at some point— and I assume that time will come, maybe even today—*if it becomes relevant, I'm going to let you play that, too, in its entirety.*" There is no question in our minds that the trial court conditioned its refusal to allow admission of the bargain portion of the tape on the fact that the defense had not yet shown its relevancy.

 At the same time Fed.R.Evid. 106 encourages completeness in writings or recordings, it restricts a requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted. *United States v. McCorkle,* 511 F.2d 482, 486 (7th Cir.1975), *cert. denied,* 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975). Of precise relevance to this case, we note that promises of immunity made in hostage situations are "irrelevant to the issue of [the defendant's] guilt or innocence of the offenses charged" and that their admission "would [be] unnecessarily confusing and potentially prejudicial." *United States v. Gorham,* 523 F.2d 1088, 1098 (D.C. Cir.1975). We find similar irrelevance and potential for prejudice here. The statement of the police officer bore no legal relation to the charges against Crosby, and

thus was properly excluded. Crosby failed to offer any theory under which the excluded portions could be considered relevant save his assertion that the change in the tone of Crosby's voice was "important to a determination of what the situation was really like." Such a theory simply does not rise to the level of relevancy required under the federal rules. Exclusion of the final tape recorded segment was not an abuse of the court's discretion.

### D. Government Attorney Comments

During the cross-examination of one of Crosby's witnesses, his close friend Gus Borges, the government counsel asked the witness about a telephone call Crosby had made to Borges' home the morning of the hostage incident. Borges had testified on direct that Crosby had called to ask if he could borrow some money. On cross-examination Borges denied that the purpose of Crosby's call was to borrow a gun. The prosecutor then asked: "Do you recall telling Dominick Nuccio [a friend of Crosby's] about three or four months after the incident at your house that Gary had come by your house to get your gun, and he said, 'I am going to blow some people's heads off at the Veterans Administration Hospital?'" Defense counsel interrupted the question with an objection, stating before the jury that the question was an "improper question, which counsel well knows." To this assertion the prosecutor replied that the question was not improper because there was a factual basis for the question which the government was prepared to provide the court.

Following this exchange, a conversation took place out of the hearing of the jury where the prosecutor explained to the court that he and another attorney for the government had interviewed Nuccio prior to trial, and that it was during this interview that Nuccio had told them of the conversation with Borges. To substantiate this, the government attorney showed the court the notes he had taken during the interview, which indicated that the question asked was a virtual verbatim representation

of what Nuccio had said. The prosecutor explained that he believed calling Nuccio to the stand would be "improper" [9] as it would result in impeaching a witness by extrinsic evidence, but that he "can put him [Nuccio] on the stand." At this point, the court overruled the defense motion and allowed the question. Borges denied that the conversation took place or that he even owned a gun.

Crosby initially argues that the prosecutor's statement before the jury that there was a factual basis for the question was improper and constituted reversible error. We note, however, that Crosby failed to object to the statement at trial and later refused the court's offer of a curative instruction to the jury. Because there was no objection below, the question is not properly before us on appeal. *United States v. Okenfuss,* 632 F.2d 483, 485 (5th Cir.1980).

Alternatively, Crosby contends that the question itself was improper. A trial court may generally limit the scope and extent of cross-examination, and its decision will not be disturbed on review unless the ruling was an abuse of its discretion. *United States v. Hawkins,* 661 F.2d 436, 444 (5th Cir.1981). This general rule is limited by the requirement that the prosecution must have some good faith factual basis for its question. Further, the question, of course, must be relevant to the issues involved at trial. Crosby contends that reversible error occurred when the government failed to call Nuccio to the stand to prove a good faith factual basis for the question at issue.

Crosby's argument is dependent upon a theory that the trial court's decision allowing the question to be asked was predicated upon the fact that the government had told the court it would call Nuccio. Our reading of the record, however, convinces us that the government's response to the court's question as to whether it was "prepared" to call Nuccio to the stand was only one of several bases on which the court made its decision that the question was proper. As stated earlier, the prosecutor told the court the specifics of its basis for the question, and even showed notes to the court which substantiated that basis. Further, the record shows that the government's "offer" to put Nuccio on the stand was merely a demonstration of the good faith of the impeaching question. It was not a promise upon which the court's ruling was conditioned. *Cf. United States v. Bright,* 588 F.2d 504, 512 (5th Cir.1979), cert. denied, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) (government's offer to reopen case and call person as witness sufficient to demonstrate the necessary good faith factual basis for cross-examination of defense character witness). Also, Crosby's attorney conceded that Nuccio confirmed to him that the conversation with Borges had taken place and that he had told the government of the conversation, although Nuccio "was not sure" what had been said. In our view, the above facts were more than adequate to permit the trial court, in its discretion, to determine that there was a good faith basis for the government's question.

Even were we to find that the question itself was improper, we fail to see how the question detracted from Crosby's defense that he was suffering from PTSD at the time of the incident. Crosby contends that allowing the jury to hear that he was prepared to "blow the head off" persons at the Veterans Administration permitted the jury to infer that Crosby was not disoriented and suffering from a PTSD "dissociative" episode, but rather was able coolly and rationally to premeditate a violent act. This contention is not persuasive.

**9.** The government explained at oral argument that it did not call Nuccio to the stand because it believed doing so would have been improper under the Federal Rules of Evidence. Under Rule 608(b) a party is not allowed to attack the credibility of a witness by the introduction of extrinsic evidence. Once Borges denied that Nuccio had made the statement, it might have been error to allow the government to call Nuccio to the stand to show that Borges had lied. The government may have been required to accept Borges' answer. *See United States v. Cohen,* 631 F.2d 1223, 1226 (5th Cir.1980); *United States v. Herzberg,* 553 F.2d 1219, 1223 (5th Cir.1977), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977).

The question concerned a visit or telephone call which preceded the events at the VA Hospital by only a few hours. The defense had presented considerable testimony in support of its theory that Crosby had become extremely depressed and upset at least 24 hours before the incident. Crosby himself testified that he became disoriented and unaware of his actions after reading a story the day before about a Vietnam veteran who had killed himself in Miami after not receiving help for his problems. These feelings intensified later, he continued, when he went to a bar and met another Vietnam veteran with whom he shared combat stories. The two men drank and took drugs. Crosby did not sleep all night nor did he remember how he got back to his home. Crosby's wife testified that Crosby was so upset when he left the house the following morning that she felt it necessary to call Nuccio and ask him not to give her husband his gun. The cumulative effect of this evidence could not have been overborne by a single question advancing a fact which was denied and which could easily have been interpreted by the jury as merely *more* evidence that Crosby was, in fact, suffering from PTSD at the time of the kidnapping.

■ A question about Crosby "blowing heads off" appears at first glance to be prejudicial. But when viewed in the context of all the testimony at Crosby's two week trial, we find it not improperly inflammatory. Dr. Richard, one of the persons initially held by Crosby in the nurses station, had earlier testified that, following his attempt to assure Crosby that he was a doctor and would help him, Crosby had responded by wheeling around and placing the shotgun two feet from Richard's chest. At this point, Richard testified, he visualized the gun's going off and he believed it likely that he would be killed. Another hostage, Patricia Porter, testified at length as to her fear that Crosby would harm the hostages. Sharman, the nurse who was held the entire three hours, testified that Crosby told him that he would not harm

him. But when in response he told Crosby that he was going to leave and walk out of the room, Crosby's reaction was to advise Sharman not to be "a damned fool." Thus, there was considerable evidence offered at the trial that Crosby in his statements, his general actions, and his wielding of the shotgun, placed his hostage victims in immediate and serious fear of losing their lives. In this context, the one question stating his alleged threat, but denied by the witness, could not create any greater degree of a threat of drastic violence than did these sustained narrations of Crosby's threats and actions.

In conclusion, therefore, we do not find that the government's failure to call Nuccio to the stand constituted reversible error. The prosecutor's belief that it would have been improper to call the witness to the stand to contradict Borges' answer was reasonable, and the trial court had a good faith factual basis to allow the prosecutor's question. There was no necessity to call Nuccio to the stand for questioning. Moreover, even if the question was improper, it did not result in any substantial prejudice to Crosby's defense.

### E. Expert Qualification

The trial court refused to qualify Harry Dougherty, a counselor at the Vet Center, as an expert in the diagnosis of PTSD in Vietnam combat veterans. The court based its refusal on the ground that PTSD was a medical diagnosis which required professional ability Dougherty did not possess.[10] Crosby complains that it was unfair for the court to qualify as an expert a doctor of osteopathy who had no board certification in psychiatry while it refused to qualify Dougherty.

■ Although Rule 702 of the Federal Rules of Evidence broadly defines those who may be qualified as experts in a given field, it is clear that a trial court has considerable discretion in determining whether an individual may testify as an expert. The expert qualification of a witness is a ques-

---

**10.** The court also refused to qualify Dougherty, who held a master's degree in social work, as an expert in the field of sociology. The court concluded that sociology had no significant relevance to the issues at trial.

tion for the trial judge, whose discretion is conclusive unless clearly erroneous as a matter of law. *United States v. Johnson,* 575 F.2d 1347, 1360 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979). The trial court's determination here was not clearly erroneous. Four psychiatrists testified at great length about Crosby's mental condition, and two defense psychiatrists testified that PTSD was often unrecognized, even by medical experts. Given the availability of this psychiatric testimony as well as the difficulty inherent in diagnosing PTSD, the trial court properly refused to classify Dougherty as an expert on the ground that only physicians could qualify as diagnostic experts concerning this medical condition.[11]

### III. *Speedy Trial Violation*

Crosby next claims that he was denied the right to a speedy trial. He bases this assertion on three claims: (1) that the Speedy Trial Act does not permit delays for the purpose of psychiatric evaluation of the sanity of a defendant; (2) that Crosby's second psychiatric examination at the federal facility in Springfield, Missouri was not excludable time under the statute; and (3) in the event that the Speedy Trial Act is found not to have been violated, the long delay between indictment and trial was a violation of the Sixth Amendment.

### A. The Speedy Trial Act

The Speedy Trial Act, 18 U.S.C. §§ 3161–3174, provides that trial must commence within seventy days of indictment.

§ 3161(c)(1). Excluded from consideration in counting the days are delays caused by a number of different reasons, including delays resulting from "mental competency" examinations. 18 U.S.C. § 3161(h)(1)(A).[12] In the instant case, 179 days elapsed between Crosby's indictment and trial. The government contends that all but 28 of those days were properly excludable under various subsections of § 3161(h). Crosby challenges the delays for the purpose of a psychiatric examination, on the ground that the statutory exclusion for "mental incompetency" relates only to examination of a defendant's competency to stand trial and not to his sanity at the time of the offense. His position is that the § 3161(h)(1)(A) exclusion did not excuse the time taken by the mental examinations, and his right to a speedy trial was violated.

The day the FBI filed its complaint against Crosby, the government filed a motion for psychiatric examination. Crosby was examined to determine both his present mental capacity as well as his capacity at the time of the offense on February 4, 1982. Following his indictment on February 26, Crosby gave formal notice of his intent to rely upon an insanity defense. On April 5, the United States magistrate ordered Crosby sent to the federal medical center in Springfield, Missouri for psychiatric examination, under the condition that he be returned to New Orleans no later than April 12. The government filed a subsequent motion the next day objecting to the deadline, alleging that medical diagnosis of Post-

---

**11.** Crosby also complains that the trial court refused to allow Dougherty to testify as to his lay opinion regarding Crosby's mental state. The record reveals, however, that the court's ruling related only to Dougherty's opinion as to whether Crosby was, in fact, suffering from PTSD. The court never ruled that Dougherty was not permitted to offer the kinds of opinion that lay persons can offer about their observations. The court explicitly instructed that Dougherty was "allowed to give the types of opinions that any lay person can give about what he sees and observes."

**12.** 18 U.S.C. § 3161(h)(1)(A) provides:

(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed,

or in computing the time within which the trial of any such offense must commence.

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant.

Other subsections of § 3161(h) exclude the time resulting from various motions such as reconsideration or removal of counsel, reconsideration of bail, motions to increase bond, to dismiss indictment, motions for continuance because of unavailability of essential witnesses, motions for discovery, to dismiss indictment, and motions in limine.

Traumatic Stress Disorder required particular expertise. Crosby was at Springfield from April 19 until July 3.

■ In support of his argument that § 3161(h)(1)(A) allows delays only for examinations into competency to stand trial, Crosby relies on case law interpreting 18 U.S.C. § 4244, which authorizes the district court to inquire into a defendant's ability to comprehend the proceedings against him and to assist counsel in the preparation and trial of his case. *United States v. Dunn,* 594 F.2d 1367, 1372 (10th Cir.1979), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979). We have already determined, however, that case law developed under 18 U.S.C. § 4244 should not be used in interpreting other rules. *United States v. Leonard,* 609 F.2d 1163, 1166 (5th Cir. 1980). Crosby cites nothing in section 3161, its legislative history, or in the case law interpreting the section which would give credence to a legislative intent to exclude sanity examinations from the purview of that section.

We agree with the government that there is no reason in logic or experience for the term "mental competency" to be given such a restricted meaning. "Competency" is often used interchangeably to denote both sanity at the time of an offense and ability to assist in the preparation of one's own defense. *See United States v. Bondurant,* 689 F.2d 1246, 1249 (5th Cir.1982); *United States v. Moudy,* 462 F.2d 694, 699 (5th Cir.1972); *United States v. Jines,* 536 F.2d 1255, 1256 (8th Cir.1976), *cert. denied,* 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 312 (1976). *See also United States v. Gilliss,* 645 F.2d 1269, 1284 (8th Cir.1981) in which the court considered psychiatric evaluation at the U.S. facility in Springfield to be excludable time under § 1361(h)(1)(A) even though examination to determine competency to stand trial under § 4244 was additionally excluded. Furthermore, if we were to accept Crosby's interpretation we would pave the way for future defendants to wait until the last moment before trial to declare their intention to rely on the insanity defense, thereby requiring the government to choose between foregoing such psychiatric examinations or violating the provisions of the Speedy Trial Act.

Delays for the purposes of evaluating an insanity defense are commonplace and well-known, *see generally United States v. Hinckley,* 525 F.Supp. 1342 (D.D.C.1981). There can be no set period required for mental examination. *Wynder v. United States,* 352 F.2d 662, 663 (D.C.Cir.1965), *cert. denied,* 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (1966). It would circumvent Congress' intention to provide for a period allowing delays for mental examinations if we interpreted the statute to exclude time for this relatively common and often lengthy type of examination.

Crosby also contends that, regardless of the applicability of the Speedy Trial Act, his second examination at Springfield violated his constitutional right to a speedy trial guaranteed by the Sixth Amendment.

■ First, it is clear that an order for a second psychiatric examination is a matter wholly within the discretion of the trial court. *See United States v. Davis,* 513 F.2d 319, 321 (5th Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976). Certainly, if the government is to have the burden of proving that a defendant is sane, it must also have the opportunity to conduct a verifying psychiatric examination as "perhaps ... the most trustworthy means of attempting to meet that burden." *United States v. Albright,* 388 F.2d 719, 724 (4th Cir.1968), *quoting Pope v. United States,* 372 F.2d 710, 720 (8th Cir.1967).[13]

■ Second, in order to prove that the delay between indictment and trial violated

---

**13.** Crosby states that, during the more than forty days he was at Springfield, he was seen by a government psychiatrist for only one hour, in violation of the Sixth Amendment as interpreted by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The government contests this claim, and contends that Crosby was under continual observation during his time at the facility. Crosby's contentions do not establish that the examination actually did not take place or was a subterfuge.

the Sixth Amendment, it is necessary that there be proof of actual, substantial prejudice or an indication of intentional, tactical delay by the prosecution. *United States v. Manetta,* 551 F.2d 1352, 1354 (5th Cir.1977). Crosby contends that the delay in this case limited his recollection of the events in question, causing him severe prejudice. In *Jamerson v. Estelle,* 666 F.2d 241 (5th Cir. 1982), we considered whether a delay of 44 months between indictment and trial caused sufficient prejudice to establish a Sixth Amendment violation. We explained that

> while 'faded memory may result in prejudice .... to constitute a speedy trial violation, the faded memory must substantially relate to a material issue.' [The defendant] has made no affirmative showing how the lapse of memory ... impaired the presentation of his defense. We cannot raise speculation or mere conclusional observations regarding a witness' memory to the level of constitutional prejudice.

*Id.* at 244, *quoting United States v. Edwards,* 577 F.2d 883, 889 (5th Cir.1978), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

A defendant who elects to invoke the insanity defense must necessarily expect that there will be attendant delay in his case. In the absence of substantial prejudice to a defendant, the government must be given the time adequately to prepare for such a defense. The forty day delay at issue here was not unreasonably prejudicial, nor was the government's request for a second psychiatric examination improper.

## IV. *Multiplicitous Counts*

Crosby was convicted of one count of kidnapping and four counts of assault with a dangerous weapon. His final argument is that the assaults were "merely part and parcel" of the kidnapping, and therefore should be dismissed as multiplicitous charges to the kidnapping.

An indictment is defective if a single offense has been charged in more than one count. *United States v. Thompson,* 624 F.2d 740, 742 (5th Cir.1980). The test to determine whether particular charges are multiplicitous is whether each requires proof of different elements and evidence. *United States v. Chrane,* 529 F.2d 1236, 1238 (5th Cir.1976). It is enough if there is one element required to prove the offense charged in one count which is not required to prove the other. *United States v. Cantu,* 557 F.2d 1173, 1176 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1977). In the instant case, the kidnapping and assault charges all require proof of different facts and different elements. The kidnapping charge required proof that (1) Crosby knowingly and willfully seized, confined, inveigled or kidnapped Sharman, (2) for the purpose of influencing the acts of the Veterans Administration, (3) within the special maritime and territorial jurisdiction of the United States. By contrast, the assault charges required proof that Crosby (1) willfully attempted or threatened to inflict injury upon someone, (2) that Crosby had an apparent present ability to inflict injury, and (3) that Crosby used or attempted to use a weapon which could have endangered life or inflicted great bodily harm during the assault. Not only is the requisite proof different for the charges of kidnapping and assault, but there is little, if any overlap between the elements. The charges clearly were not multiplicitous, and Crosby's conviction on all counts was proper.[14]

## V. CONCLUSION

We find the evidence sufficient to support the jury's verdict that Crosby kidnapped Sharman for "ransom or reward or otherwise." We also find that the district court did not abuse its discretion in excluding from evidence Crosby's prior writings and statements, certain Vet Center records, and the final segment of a tape recording

---

**14.** Crosby makes no claim that he cannot be found guilty of assault upon four different individuals arising from the same incident. Obviously, a person may be charged with more than one crime if his acts are directed at more than one person. *United States v. Shaw,* 701 F.2d 367, 396 (5th Cir.1983).

of the hostage negotiations. Similarly, the trial court did not abuse its discretion in refusing to qualify a Vet Center counselor as an expert witness. Further, no prejudicial error was committed by the prosecutor's comment and question during the cross examination of Gus Borges. Finally, the time which elapsed between Crosby's indictment and trial violated neither the Speedy Trial Act nor the Sixth Amendment, and the charges against him were not multiplicitous. The judgment of the district court is

AFFIRMED.