Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 14, 2004          Decided July 30, 2004

No. 03-7117

BLAKE KILBURN, INDIVIDUALLY ON HIS OWN BEHALF, AND AS EXECUTOR OF THE ESTATE OF PETER C. KILBURN, DECEASED, APPELLEE

v.

SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA AND LIBYAN EXTERNAL SECURITY ORGANIZATION, APPELLANTS

———

Appeal from the United States District Court for the District of Columbia (No. 01cv01301)

———

*Arman Dabiri* argued the cause and filed the briefs for appellants.

*Douglas Hallward–Driemeier*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellee. With him on the brief

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, *Douglas N. Letter*, Counsel, and *Mark Clodfelter*, Assistant Legal Advisor, Department of State.

*Stuart H. Newberger* argued the cause for appellee Blake Kilburn. With him on the brief were *Clifton S. Elgarten* and *Michael L. Martinez*.

Before: GINSBURG, *Chief Judge*, and GARLAND and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: This case arises out of the kidnaping and murder of an American citizen in Lebanon between November 1984 and April 1986. Libya appeals from the denial of its motion to dismiss the case, arguing that sovereign immunity protects it from suit and that the plaintiff lacks a viable cause of action. We reject the first contention, concluding that the "terrorism exception" of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(7), strips Libya of the shield of sovereign immunity. We decline to exercise appellate jurisdiction over the second.

I

Blake Kilburn brought suit against the Socialist People's Libyan Arab Jamahiriya (Libya), the Libyan External Security Organization (LESO), the Islamic Republic of Iran, and the Iranian Ministry of Information and Security, seeking damages on his own behalf and as executor of the estate of his brother, Peter Kilburn (together, the plaintiff), for Peter's kidnaping, sale, torture, and death. The allegations of the complaint, as further detailed in district court pleadings and a declaration, are as follows.

Peter Kilburn was an American citizen who lived in Lebanon and worked as an instructor and librarian at the American University of Beirut. On November 30, 1984, he was abducted from his apartment; Hizbollah, a terrorist organization funded by Iran, claimed responsibility. In late 1985, the American government was approached by an intermediary

who claimed to be acting on behalf of Kilburn's captors and who sought a ransom for his return. For the next several months, the United States negotiated for Kilburn's release.

On April 14, 1986, while Kilburn was still in captivity, the United States conducted airstrikes on Tripoli, Libya, in retaliation for Libya's involvement in the bombing of a Berlin nightclub that killed two American soldiers. Thereafter, Libya made it known that it wanted to purchase an American hostage to murder in revenge for the airstrikes. Sometime between April 14 and 17, the Arab Revolutionary Cells (ARC), a terrorist organization sponsored by Libya, bought Kilburn from Hizbollah for approximately $3 million and subsequently tortured him. On or about April 17, 1986, ARC murdered Kilburn and left his body by the side of a road near Beirut, alongside the bodies of two British hostages. In a note found nearby, ARC claimed responsibility.

Blake Kilburn's complaint, filed on June 12, 2001, alleged that his brother was the victim of hostage taking, torture, and extrajudicial killing, for which the defendants were responsible. The complaint sought recovery through multiple causes of action, including the Flatow Amendment, 28 U.S.C. § 1605 (note), and theories of wrongful death, battery, assault, false imprisonment, slave trafficking, torture, and intentional infliction of emotional distress. Although the complaint did not specify the legal sources of the latter causes of action, later pleadings asserted that they arose under state common law, foreign law, and international law, and that additional federal statutory causes of action might also be available.

The Iranian defendants did not appear, and the plaintiff sought a default judgment against them. That motion remains pending in the district court. The Libyan defendants did appear, and the parties agreed to a limited course of jurisdictional discovery. Thereafter, the Libyan defendants filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), contending that their sovereign immunity deprived the court of subject-matter jurisdiction, and pursuant to Rule 12(b)(6), contending that the plaintiff had failed to state a claim upon which relief could be

granted. The district court denied both requests. Sua sponte, the court also considered a question not raised by the parties — whether the plaintiff could assert a claim for punitive damages against defendant LESO — and answered in the affirmative. This appeal followed.[1]

## II

We begin with the question of the Libyan defendants' sovereign immunity. The district court's decision to deny their motion to dismiss plainly did not end the case; to the contrary, it permitted the case to go forward. Ordinarily, that would preclude our hearing this interlocutory appeal, because our jurisdiction is generally confined to "final decisions of the district court." 28 U.S.C. § 1291; *see id.* § 1292 (permitting interlocutory appeals in certain circumstances not present here). Under the collateral order doctrine, however, an order qualifies as "final" under § 1291 if it: "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (internal quotation marks omitted); *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The denial of a motion to dismiss on the ground of sovereign immunity satisfies all three criteria, and is therefore subject to interlocutory review. *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1025–26 (D.C. Cir. 1997); *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990). In

---

[1] The defendants also sought, and the district court denied, dismissal on the ground that the court's exercise of personal jurisdiction over them violated the due process clause of the Fifth Amendment. Although the defendants recognize that this circuit has held that "foreign states are not 'persons' protected by the Fifth Amendment," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002), they raise the issue solely to preserve the possibility of further appellate review.

particular, with respect to the last criterion, an "order deny-ing dismissal for immunity is effectively unreviewable on appeal because 'sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits.'" *Jungquist*, 115 F.3d at 1026 (quoting *Foremost-McKesson*, 905 F.2d at 443).

Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions (or as provided by international agreements). 28 U.S.C. § 1604; *see id.* §§ 1605–1607. If no exception applies, the district court lacks subject matter jurisdiction. *Id*. § 1604. If an exception does apply, the district court has jurisdiction. *Id*. § 1330(a); *see World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002); *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).

Congress amended the FSIA in the Antiterrorism and Effective Death Penalty Act of 1996, adding an additional exception colloquially known as the "terrorism exception." That exception denies sovereign immunity in any case:

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency. . . .

28 U.S.C. § 1605(a)(7). This exception applies only if three additional criteria are also satisfied: the foreign state was designated a "state sponsor of terrorism" at the time the act occurred; the foreign state was given a reasonable opportuni-ty to arbitrate a claim regarding an act that occurred within the state's borders; and the claimant or victim was a national of the United States. *Id*. § 1605(a)(7)(A), (B). There is no dispute that these criteria are satisfied here. The only question is whether the plaintiff's claims fall within the main

body of the exception, upon which the jurisdiction of the district court depends.

"In order to preserve the full scope of sovereign immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible." *Phoenix Consulting,* 216 F.3d at 39 (quoting *Foremost–McKesson*, 905 F.2d at 449). In making that determination, the nature of the court's inquiry depends on the nature of the defendant's challenge. "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA] exceptions to immunity invoked by the plaintiff." *Id*. at 40. But if the defendant challenges "the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.*

In their motion to dismiss, the Libyan defendants challenged both the legal and factual sufficiency of the plaintiff's claims. For the sake of clarity, we address these challenges separately in Parts III and IV. Our standard of review is de novo. *See Price*, 294 F.3d at 91.

## III

The Libyan defendants maintain that, even if the allegations of the complaint are true, they fail to bring this case within the compass of the terrorism exception. That contention is founded on two legal arguments regarding the scope of the exception.

## A

The defendants' first argument is that § 1605(a)(7) requires, as a matter of jurisdiction, a causal connection between the foreign state's alleged acts and the victim's alleged

injuries. Stated at that level of generality, the defendants are plainly right. The section provides an exception to sovereign immunity in any case in which money damages are sought for injury or death "that was *caused by* an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605(a)(7) (emphasis added). As we are generally required to give effect to every statutory term, *Duncan v. Walker*, 533 U.S. 167, 174 (2001), we cannot ignore the phrase "caused by." Moreover, because § 1605(a)(7) is a jurisdictional provision, *see Cicippio–Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004), causation is indeed a jurisdictional requirement.

It is here, however, that we part company with the defendants. They contend not merely that § 1605(a)(7) requires a causal connection, but that it specifically requires "but for" causation: that is, an allegation (and, ultimately, evidence) that "but for" Libya's actions, Peter Kilburn would not have been purchased, tortured, or killed. The defendants apparently regard "but for" as a particularly restrictive standard of causation, and insist that nothing less will do.[2]

As a moment's inspection of § 1605(a)(7) makes clear, there is no textual warrant for this claim: the words "but for" simply do not appear; only "caused by" do. *Cf. Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (rejecting the suggestion that the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), which requires a "direct effect" in the United States for acts performed elsewhere, "contains

---

[2] "But for" causation may be restrictive in some circumstances, such as the multiple actors example discussed in the text below. *See* PROSSER & KEETON ON THE LAW OF TORTS 66–67 (5th ed. 1984). Often, however, it is viewed as an expansive theory. *See, e.g.*, *Pryor v. American President Lines*, 520 F.2d 974, 978 n.4 (4th Cir. 1975) (describing "but for" causation as a potentially "limitless" standard under which "Eve's trespass caused all our woe" (citing 2 HARPER & JAMES, THE LAW OF TORTS 1108 (1956))); *see generally* PROSSER & KEETON, at 266 (noting that the breadth of "but for" causation may depend on whether it is employed as a rule of inclusion or exclusion).

any unexpressed requirement of 'substantiality' or 'foreseeability' "). In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995), the Supreme Court interpreted "caused by" in another jurisdictional statute to require only a showing of "proximate cause." We follow the Court's example here.

In *Grubart*, jurisdiction turned on the meaning of the Extension of Admiralty Jurisdiction Act, which provides that the admiralty jurisdiction of the United States "shall extend to . . . all cases of damage or injury . . . *caused by* a vessel on navigable water." 46 U.S.C. app. § 740 (emphasis added). Rejecting the contention that "caused by" means that the damage must be close in time and space to the activity that caused it, the Court held that the phrase means only "what tort law has traditionally called 'proximate causation.' " *Grubart*, 513 U.S. at 536. As the Court explained, "this classic tort notion normally eliminates the bizarre." *Id.*; *see generally* PROSSER & KEETON ON THE LAW OF TORTS 263 (5th ed. 1984) (noting that an "essential element of the plaintiff's cause of action" for any tort "is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," a "connection usually . . . dealt with by the courts in terms of what is called 'proximate cause' "). "There is no need or justification," the Supreme Court said, "for imposing an additional nonremoteness hurdle in the name of jurisdiction." *Grubart*, 513 U.S. at 538.

The essence of the Libyan defendants' argument is that here there is a "need or justification" for imposing an additional hurdle beyond proximate cause, and that "but for" cause is the appropriate hurdle. They offer the following hypothetical:

> A terrorist organization is supported by two foreign states. One specifically instructs the organization to carry out an attack against a U.S. citizen. Can the state which only provides general support, but was not involved with the act giving rise to the suit, also be stripped of its immunity?

Reply Br. at 13. "The answer" to this hypothetical, the defendants assert, "clearly must be no." *Id.* Libya's argument fails to persuade for several reasons.

First, we are not moved by the plight of Libya's hypothetical foreign state. We see no reason why there would be a greater justification for — or why Congress would have a greater interest in — protecting a party haled into court under § 1605(a)(7) than one trying to resist admiralty jurisdiction. After all, the only defendants that are subject to § 1605(a)(7) in the first place are those that the State Department has designated as "state sponsor(s) of terrorism." 28 U.S.C. § 1605 (a)(7)(A).

Second, § 1605(a)(7) permits actions for injuries caused by "material support" of terrorist acts by such state sponsors, and, as Congress recognized, such support is difficult to trace. As the House Report on the terrorism exception stated:

> [S]tate sponsors of terrorism include Libya, Iraq, Iran, Syria, North Korea, Cuba, and Sudan. These outlaw states consider terrorism a legitimate instrument of achieving their foreign policy goals. *They have become better at hiding their material support for their surrogates,* which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like. *For this reason, the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts . . . is warranted.*

H.R. Rep. No. 104–383, at 62 (1995) (emphasis added). Accordingly, the more likely situation is not Libya's hypothetical, involving one direct and one general state sponsor, but rather the case in which multiple foreign states claim to be providing only "general support." Such a case, in which application of a "but for" standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard "but for" causation as inappropriate. *See* PROSSER & KEETON, at 266–67.

Third, Libya's hypothetical (and its argument) deals solely with a claim based on a state's general "material support" for a terrorist organization. But "the provision of material support" for a terrorist act is only one of the predicates for the § 1605(a)(7) exception. Foreign states also lose immunity for acts (of torture, extrajudicial killing, or hostage taking) "engaged in by an official, employee, or agent" of the state itself. 28 U.S.C. § 1605(a)(7). Libya makes no argument at all as to why a restrictive standard of causation should be imposed in direct action cases, yet the statutory phrase "caused by" applies equally to every § 1605(a)(7) case.[3]

Finally, we underline that the only issue before us here is *jurisdictional* causation, because § 1605(a)(7) is solely a jurisdictional provision. *Cicippio–Puleo*, 353 F.3d at 1032. To succeed in the end, the plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action. *Id*. The plaintiff has alleged a number of sources that could provide a cause of action, including state, federal, foreign, and international law. Whatever the ultimate source may be, it will no doubt carry with it — as a matter of substantive law — its own rules of causation. Of these, there are a large variety. *See* Prosser & Keeton, at 266–68, 273. Any concerns about reaching too far to charge foreign states with the attenuated impact of their financial activities are better addressed as questions of substantive law. Indeed, to go further as a matter of jurisdiction — to accept Libya's contention that § 1605(a)(7) requires a single causation standard that is more restrictive than the base-line standard of proximate cause — runs afoul of the FSIA's injunction that a non-immune "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

---

[3] Prosser suggests that a standard like "but for" is particularly ill-suited to direct action cases. *See* Prosser & Keeton, at 266 (stating that the "but for" rule fails in the following case: "A stabs C with a knife, and B fractures C's skull with a rock; either wound would be fatal, and C dies from the effects of both").

In this case, there is no doubt that the plaintiff's allegations satisfy the proximate cause standard. The complaint alleges that, after the United States bombed Tripoli, "Libyan agents in Lebanon made it known that they wanted to purchase an American hostage to murder in retaliation." Compl. ¶ 13. It specifically asserts that Peter Kilburn "was purchased and killed by members of the Arab Revolutionary Cells," *id.* ¶ 21, "whose acts were funded *and directed* by Libya," *id.* ¶ 26 (emphasis added). A subsequent declaration makes clear that the plaintiff's allegation is not just that ARC was "supported" and "funded" by the Libyan government, but that it was "directed" by that government "and acted as its agent in Lebanon to carry out terrorist activities, including the purchase and assassination of Peter Kilburn." Decl. of Ambassador Robert Oakley (Ret.) ¶ 14 (hereinafter "Oakley Decl."). If proven, these allegations are more than sufficient to establish that the acts of the Libyan defendants were the proximate cause of Peter Kilburn's injury and death.

## B

The Libyan defendants also advance a second argument in favor of a restrictive view of § 1605(a)(7). Noting that the statute denies sovereign immunity for claims involving injury caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... *for such an act*," 28 U.S.C. § 1605(a)(7) (emphasis added), they insist that to come within this provision, a state's material support must go directly for the specific act (e.g., torture) that gives rise to the claim. In the instant case, the defendants contend that § 1605(a)(7) requires the plaintiff to allege (and, ultimately, to prove) that Libya *directly* funded ARC's purchase, torture, and murder of Peter Kilburn — not just that Libya provided material support to ARC.

Although the defendants pose this as an independent restriction on the scope of § 1605(a)(7), it is closely tied to their causation argument and suffers from some of the same defects. On the one hand, imposing a jurisdictional require-

ment that a state sponsor's financial assistance to a terrorist organization must be *directly* traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual. Money, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records. On the other hand, the requirement that the plaintiff's injury be "caused by" the provision of material support — in the sense of proximate causation, *see supra* Part III.A — should ameliorate most concerns about remoteness. Any further concerns will likely be addressed by the substantive law that governs the applicable cause of action. *See generally Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1560 (D.C. Cir. 1992) (noting that it "is axiomatic that under a negligence regime, one has a duty to guard only against foreseeable risks"); *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1012 (7th Cir. 2002) (holding that, to establish a private cause of action for material support of terrorism under 18 U.S.C. §§ 2333, 2339A, "the plaintiffs must be able to show that [the murder of their son by Hamas] was a reasonably foreseeable result of [defendants'] making a donation" to Hamas).

In any event, Libya's textual argument has no application here. The plaintiff does not allege that Libya merely provided material support to ARC, but rather that it specifically funded and directed Peter Kilburn's purchase and murder. *See* Oakley Decl. ¶ 16; *see also id.* ¶¶ 6, 11–14; Compl. ¶ 23. Indeed, the plaintiff's claims rest not only on a theory of material support, but also on a theory of agency. The plaintiff asserts that ARC was not just some independent organization that Libya provided with funds, but rather an "agent" of Libya. *See* Oakley Decl. ¶ 14. In statutory terms, plaintiff's allegation is that Peter Kilburn's injuries and death were caused by terrorist acts "engaged in by an . . . *agent* of [a] foreign state" — and not merely by "provision of material support . . . for such an act." 28 U.S.C. § 1605(a)(7) (emphasis added). The "for such an act" language that Libya highlights plays no textual role with respect to those kinds of allegations. To the contrary, Libya is responsible for the acts

of its agent "within the scope of ... [its] agency," *id.*, regardless of whether Libya financed those acts — provided, of course, that the elements of agency are established. *See Foremost–McKesson*, 905 F.2d at 445 (holding that a foreign state is responsible for the actions of a commercial entity if it "exercise[s] the necessary degree of control over [it] to create a principal/agent relationship"); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848–49 (D.C. Cir. 2000) (same); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 n.16 (D.C. Cir. 1982) (same).

## IV

We turn next to defendants' challenge to the factual basis for the district court's jurisdiction. As explained above, if a defendant invoking sovereign immunity challenges "the factual basis of the court's jurisdiction," the court "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting*, 216 F.3d at 40. To resolve such a factual dispute, however, the court "retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Id.* (quoting *Prakash v. American Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984)); *see Grubart*, 513 U.S. at 537 (noting that "any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure").

Contrary to defendants' assertion, the district court understood its responsibilities in this regard. *See Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 29–30, 33 (D.D.C. 2003) (citing *Phoenix Consulting*, 216 F.3d at 40). In this case, the parties agreed to limited jurisdictional discovery, pursuant to which the plaintiff provided the defendants with supporting documents from the CIA and State Department, and with a declaration by retired Ambassador Robert Oakley. Oakley was the State Department's Coordinator for Counterterrorism during the period of Peter Kilburn's kidnaping and murder. Plaintiff also produced a list of witnesses who would

testify to Libya's responsibility. No depositions were conducted or sought. After reviewing these materials, the district court concluded that denial of the motion to dismiss was warranted. We agree.

" 'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting*, 216 F.3d at 40 (quoting *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)); *see Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994). We have never decided whether, in addition to the ultimate burden of persuasion, the defendant also bears the initial burden of production.[4] But even if the plaintiff has the burden of production, he has satisfied it. Ambassador Oakley's declaration states that he would testify — both as an expert and based on first-hand knowledge of some of the events in question — that ARC was an agent of Libya, that it purchased, tortured, and killed Peter Kilburn, and that the Libyan government expressly provided the funds for the purchase and directed the killing. *See* Oakley Decl. ¶¶ 11–17. Given that the only discovery to date has been that which the plaintiff has voluntarily accorded the defendants, and that the plaintiff has not yet had an opportunity to conduct any, that is more than sufficient to satisfy any possible burden of production at this stage of the litigation.[5]

---

[4] *Compare Gould, Inc. v. Pechiney Ugine Kuhlmann & Trefimetaux*, 853 F.2d 445, 451 & n.5 (6th Cir. 1988) (indicating that the foreign state defendant bears the burden of going forward with evidence that the alleged act does not come within an exception to sovereign immunity), *and* H.R. Rep. No. 94–1487, at 6616 (1976) (same), *with Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (holding that the burden of production shifts to the plaintiff if the defendant presents a prima facie case that it is a foreign sovereign).

[5] *See Phoenix Consulting*, 216 F.3d at 40 (holding that the district court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction") (citation

It is equally plain that the Libyan defendants have so far satisfied neither a burden of production nor their required burden of persuasion. They submitted no affirmative evidence whatsoever to show that they fall outside the terrorism exception. They did not, for example, file an affidavit denying that their agents purchased or killed Peter Kilburn. *Cf. Phoenix Consulting*, 216 F.3d at 39 (noting that, by filing a sworn declaration that an alleged written contract was a forgery, the foreign state defendant disputed the plaintiff's claim that it had waived sovereign immunity through the contract). They did not proffer testimony denying that they had provided material support for those acts. They did not even deny that ARC was their agent.

What the defendants did do, instead, was to point out what they see as "contradictions" between the plaintiff's claims and some passages in the CIA and State Department documents. These asserted contradictions primarily involve reports that multiple terrorist organizations had claimed responsibility for hostage taking in Lebanon during the relevant period. Although the defendants do not explain the significance of these reports or what they contradicted, presumably the defendants believe the reports suggest that a Libyan-sponsored organization did not carry out the acts in question. But the reports do not deny that a Libyan-sponsored organization purchased or killed Peter Kilburn; nor do they suggest that such an organization was not a proximate cause of those acts, even if not the sole cause. In fact, it is not apparent that the asserted "contradictions" have any relevance at all to this case.[6]

and internal quotation marks omitted); *see also Grubart*, 513 U.S. at 537–38 ("Normal practice permits a party to establish jurisdiction at the outset of a case by means of a nonfrivolous assertion of jurisdictional elements . . . and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection).") (citations omitted).

[6] Some of those asserted contradictions do not appear to relate to Peter Kilburn. For example, although the defendants point to a

In short, the defendants have failed to satisfy their "burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting*, 216 F.3d at 40. The district court was therefore right to deny their motion to dismiss for lack of jurisdiction under Rule 12(b)(1).

V

In addition to challenging the district court's jurisdiction, the Libyan defendants also sought dismissal pursuant to Rule 12(b)(6), contending that the plaintiff had failed to state a claim upon which relief could be granted. The district court denied that motion and, at the same time and sua sponte, held that defendant LESO could be subject to punitive damages if it were ultimately found liable. The Libyan defendants seek review of both decisions. In particular, they note that this circuit has recently held that one of the causes of action plaintiff asserted, the Flatow Amendment, 28 U.S.C. § 1350 (note), does not "creat[e] a private right of action against a foreign government." *Cicippio–Puleo*, 353 F.3d at 1033. The Libyan defendants further argue that *no* other cause of action is available to plaintiffs who bring suit under § 1605(a)(7). *But cf. id.* at 1035 (declining to decide whether terrorism victims invoking § 1605(a)(7) have other causes of action).

CIA report that five terrorist organizations had claimed responsibility for hostages taken in Lebanon in March of 1984, *see* CIA, Terrorism Review 735 (Apr. 8, 1985) (attached to Defs.' Mot. to Dismiss, App. D), Kilburn was not kidnaped until November of that year. Others do not appear to relate to the Libyan defendants. For example, although the defendants stress a State Department document stating that Kilburn was originally kidnaped by Islamic Jihad (presumably in contradiction to the allegation that the original kidnaping was by Hizbollah), *see* Department of State, Unclassified Documents 3 (attached to Defs.' Mot. to Dismiss, App. F), the complaint does not allege that Libya played a role in the original kidnaping. Nor does the document address the complaint's contention that Islamic Jihad and Hizbollah are one and the same. *See* Compl. ¶ 4.

Denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is not ordinarily subject to interlocutory appeal. It is neither a final decision nor a proper subject for appeal under the "collateral order" doctrine. *Price*, 294 F.3d at 91. Whether conclusive or not, it plainly is not separate from the merits. And it is eminently reviewable on appeal from the final judgment; indeed, that is the usual way in which Rule 12(b)(6) decisions are appealed. *See generally Cohen*, 337 U.S. at 541. The defendants do not disagree. Instead, they urge us to assume jurisdiction over the non-immunity issues as "pendent" to the sovereign immunity decision over which we have interlocutory jurisdiction.

The leading case on pendent appellate jurisdiction is *Swint v. Chambers County Commission*, 514 U.S. 35 (1995). In *Swint*, the Supreme Court expressed some skepticism about the existence of pendent appellate jurisdiction altogether, and particularly about a " 'liberal' or 'flexible' approach" to the issue. 514 U.S. at 47 n.5. The Court ultimately concluded that it "need not definitively or preemptively settle here whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable." *Id.* at 50–51. But it held that there was no such jurisdiction in that case, because the proposed pendent issue and the properly appealable issue were not "inextricably intertwined," and because review of the former decision was not "necessary to ensure meaningful review" of the latter. *Id.* at 51. Subsequently, in *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997), the Court held that pendent jurisdiction was proper where both the "inextricably intertwined" and "necessary to ensure meaningful review" conditions were satisfied.

In *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675 (D.C. Cir. 1996), we declined to exercise pendent jurisdiction over the appeal of an order holding a party liable for attorney's fees. We said that we would "exercis[e] pendent appellate jurisdiction sparingly," and "only when substantial considerations of fairness or efficiency demand it." 85 F.3d at 678–79. We also said, however, that while "[s]ome courts read *Swint* to permit pendent appellate jurisdiction *only*

when the [two *Swint* conditions] obtain," we did "not think [*Swint*] meant to prescribe a definitive or exhaustive list of conditions." *Id.* at 679 n.4.

The other circuits have taken a different path, saying that they will take pendent appellate jurisdiction *only* when one or both of the *Swint* conditions appear,[7] and criticizing our more permissive reading of *Swint*.[8] But despite using more expansive language, we have so far largely confined the doctrine to cases that come within one or the other of the *Swint* conditions,[9] or that involve questions like personal jurisdiction[10] or the statute of limitations[11] — which we have described as "logically antecedent" or "threshold" issues. *See Barbour v. WMATA*, 2003 WL 22095655, at *1 (D.C. Cir. 2003).

---

[7] *See Limone v. Condon*, 2004 WL 1299980, at *9–10 (1st Cir. 2004); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 758 (2d Cir. 1998)*; E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin*, 269 F.3d 187, 203 (3d Cir. 2001)*; Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996); *Thornton v. General Motors Corp.*, 136 F.3d 450, 453–54 (5th Cir. 1998); *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998); *Jones v. InfoCure Corp.*, 310 F.3d 529, 536 (7th Cir. 2002); *Woolfolk v. Smith*, 81 F.3d 741, 743 (8th Cir. 1996); *Watkins v. Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998); *Sevier v. Lawrence*, 60 F.3d 695, 701 (10th Cir. 1995); *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000).

[8] *See Rein*, 162 F.3d at 758; *see also Limone*, 2004 WL 1299980, at *9–10.

[9] *See, e.g.*, *National R.R. Passenger Corp. v. Express Trak, L.L.C.*, 330 F.3d 523, 528 (D.C. Cir. 2003) (exercising pendent jurisdiction where both *Swint* conditions existed); *United States ex rel. Long v. SCS Bus. & Tech Inst., Inc.*, 173 F.3d 870, 873–86 (D.C. Cir. 1999) (same where the issues were "inextricably intertwined"); *Twelve John Does v. District of Columbia*, 117 F.3d 571, 574–75 (D.C. Cir. 1997) (same).

[10] *See Jungquist*, 115 F.3d 1020.

[11] *See Griggs v. WMATA*, 232 F.3d 917, 919 & n.2 (D.C. Cir. 2000); *Rendall–Speranza v. Nassim*, 107 F.3d 913, 916–17 (D.C. Cir. 1997).

This case does not fit any of those rubrics. Whether state tort law properly provides the plaintiff with a cause of action, for example, is not inextricably linked with, or necessary for meaningful review of, the proper scope of jurisdictional causation under § 1605(a)(7). To the contrary, as we noted in Part III, these are analytically distinct questions. Nor can the cause of action question fairly be characterized as an antecedent or threshold issue. The question of whether the plaintiff has a cognizable cause of action (and what that cause of action might be) is not a question separate from the merits; it *is* the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). And all of this is, of course, a fortiori regarding the question of whether LESO, if liable, can be assessed punitive damages.

It is true that we did, in one case, decide to take pendent jurisdiction over a merits question (whether the Washington Metropolitan Area Transit Authority was subject to the District of Columbia's Freedom of Information Act), in order to avoid what we described as a "difficult" state sovereign immunity question. *See KiSKA Constr. Corp.–U.S.A. v. WMATA*, 167 F.3d 608, 611 (D.C. Cir. 1999).[12] But that decision is not precedent for taking pendent appellate jurisdiction here. As we have already decided that Libya lacks immunity, there is nothing for us to avoid in this case.[13] Nor

---

[12] In another interlocutory appeal, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003), we decided a merits question after deciding an immunity question. We did not, however, discuss our authority to do so, and "the existence of unaddressed jurisdictional" questions deprives a decision of "precedential effect" on those questions. *Lewis v. Casey*, 518 U.S. 343, 353 n.2 (1996); *see Steel Co.*, 523 U.S. at 91.

[13] *Compare also Long*, 173 F.3d at 893, 895 (distinguishing *Steel Co.* and holding that the availability of a statutory cause of action may be determined before deciding the "quasi-jurisdictional" question of Eleventh Amendment immunity), *with Steel Co.*, 523 U.S. at 93 (holding that a merits issue may not be determined before a jurisdictional question), *and* 28 U.S.C. § 1604 (providing that "a foreign state shall be immune from the *jurisdiction* of the courts" unless the FSIA provides an exception) (emphasis added).

would it be fair to characterize the immunity questions discussed in Parts III and IV as particularly "difficult." Although we have discussed the legal aspects of causation in some detail, the allegations that the Libyan defendants were directly involved in Peter Kilburn's ordeal make the bottom-line conclusion that the defendants lack immunity quite easy. And, as we said in *Gilda Marx*, "parties should not be encouraged to bring insignificant, but final, matters before this court as mere vehicles for pendent review of numerous or complex orders that are not independently appealable." 85 F.3d at 679; *see also Swint*, 514 U.S. at 49–50 (warning that "a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay *Cohen*-type collateral orders into multi-issue interlocutory appeal tickets").

The Libyan defendants complain that, if we decline to take pendent jurisdiction over the non-immunity rulings, they may be required to go through an entire trial on a complaint that may eventually be determined to have no cognizable cause of action. This possibility would concern us, of course, had we not already concluded that the defendants lack immunity from this litigation. In light of that conclusion, however, the Libyan defendants are in the same position as any others. To permit an appeal of the denial of a Rule 12(b)(6) motion merely because it might spare the defendants the pain of trial would greatly expand the "small category of decisions" subject to the collateral order doctrine, *Swint*, 514 U.S. at 42, and undermine our promise to exercise pendent appellate jurisdiction "sparingly," *Gilda Marx*, 85 F.3d at 679. As the court said in *Swint* with respect to the collateral order doctrine: " '§ 1291 requires courts of appeals to view claims of a right not to be tried with skepticism, if not a jaundiced eye,' for 'virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a right not to stand trial.' " 514 U.S. at 43 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994)).

We do not dispute that both the district court and the parties would benefit from advance knowledge of this circuit's view as to whether the plaintiff has a cause of action against the defendants. But the Supreme Court has rejected that as

a sufficient reason to permit appeal on a theory of pendent jurisdiction.[14] And Congress has expressly provided another route for just such a situation. Section 1292(b) of Title 28 authorizes a district court to certify in writing that an "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). When the district court so certifies, the court of appeals "may thereupon, in its discretion, permit an appeal to be taken from such order." *Id.* Indeed, the *Swint* court pointed to § 1292(b) as a reason for caution regarding pendent appellate jurisdiction:

> Congress thus chose to confer on district courts first line discretion to allow interlocutory appeals. If courts of appeals had discretion to append to a *Cohen*-authorized appeal from a collateral order further rulings of a kind neither independently appealable nor certified by the district court, then the two-tiered arrangement § 1292(b) mandates would be severely undermined.

*Swint*, 514 U.S. at 47. The district court has not issued a § 1292(b) certification here.

In the final balance, whether or not we have authority to exercise pendent appellate jurisdiction in this case, there is no question that we have discretion to decline to do so. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1118 (D.C. Cir. 2000); *Gilda Marx*, 85 F.3d at 679–80. For the foregoing reasons, and because taking pendent jurisdiction here would mean straying far from *Swint*, we decline to pass on the rulings of the district court that are not related to the question of the defendants' immunity.

---

[14] *See Swint*, 514 U.S. at 43–44 (rejecting an argument that judicial economy warranted the exercise of pendent jurisdiction in that case, notwithstanding that if the defendant were correct, "reviewing the district court's order would put an end to the entire case" against it) (internal quotation marks omitted).

## VI

We affirm the district court's determination that it had subject-matter jurisdiction to adjudicate the plaintiff's claims against the Libyan defendants. We decline to exercise appellate jurisdiction over defendants' other challenges.