Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 18, 2006     Decided November 21, 2006

No. 05-7048

SANDRA JEAN SIMPSON, INDIVIDUALLY
AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
DR. MOSTAFA FAHMY KARIM, DECEASED,
APPELLEE

v.

SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01722)

———

*Arman Dabiri* argued the cause and filed the briefs for appellant.

*Eric C. Sorenson* argued the cause and filed the brief for appellee.

Before: ROGERS and GARLAND, *Circuit Judges,* and

SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal follows our remand to afford the plaintiffs an opportunity to amend their complaint to state a cause of action for hostage taking under the 1996 Terrorism Amendment to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7). *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230 (D.C. Cir. 2003) ("*Simpson I*"). Libya contends that the district court lacks subject matter jurisdiction and makes both legal and evidentiary challenges to the amended complaint. We hold that because the FSIA definition of hostage taking, 28 U.S.C. § 1605(e)(2), focuses on the state of mind of the hostage taker, a plaintiff need not show that the hostage taker communicated a demand reflecting the hostage taker's intended purpose to a third party. We assume here that a plaintiff asserting an exception to sovereign immunity under FSIA has a burden of production to support its allegations of hostage taking, and further hold that the plaintiffs met their burden and, conversely, that Libya has failed to meet its burden of persuasion. Libya offers no evidence of its own and points to nothing in the plaintiffs' evidence that is inconsistent with the allegations in the amended complaint about Libya's possible intended purposes for the detention. Accordingly, we affirm the order denying Libya's motion to dismiss the amended complaint on sovereign immunity grounds.

## I.

In February 1987, Sandra Jean Simpson, a United States citizen, and her husband, Dr. Mostafa Karim, a permanent resident of the United States who was born in Egypt, were aboard the Carin II, a private yacht, cruising in the

Mediterranean Sea on a course from Italy to Greece, when an unexpected storm forced the boat to veer off course and send a radio distress signal. Libyan harbor authorities responded to the signal on February 10, 1987, offering the port of Benghazi as a safe harbor. According to the amended complaint, on February 14, 1987, while the boat was in port, Libyan authorities boarded the boat and removed the passengers and crew. The Libyans held the Carin II party captive and threatened to shoot them if they attempted to leave. Three months into the captivity, Libyan authorities forcibly separated Ms. Simpson and Dr. Karim, permitting Ms. Simpson to fly to Zurich and placing her husband in solitary confinement, in unsanitary conditions without adequate medical care or proper food, for a period of seven months. Dr. Karim was released from captivity in November 1987, after intense negotiations among Belgium, Egypt, and Libya; he died of cancer in 1993.

Ms. Simpson and her husband's estate sued Libya, alleging torture, hostage-taking, battery, false imprisonment, intentional infliction of emotional distress, and loss of consortium, and seeking compensatory damages. Libya moved to dismiss the complaint for: (1) lack of subject-matter jurisdiction, on the ground that Ms. Simpson's offer to arbitrate did not satisfy FSIA's jurisdictional requirements; (2) lack of personal jurisdiction; and (3) failure to state a claim for torture and hostage taking. The district court denied the motion. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 180 F. Supp. 2d 78, 89 (D.D.C. 2001). On appeal, this court held that Ms. Simpson's offer to arbitrate satisfied the jurisdictional requirements of FSIA, *see* 28 U.S.C. § 1605(a)(7)(B)(I), but reversed as to the torture claim for insufficient allegations of severity, citing *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91-93 (D.C. Cir. 2002) ("*Price I*"), and vacated and remanded on the hostage-taking claim so that the plaintiffs could amend the complaint to allege facts supporting

the proposition that Libya intended to compel action or inaction by a third party as a condition of releasing Ms. Simpson and Dr. Karim.  *Simpson I*, 326 F.3d at 233-35.

In response, the plaintiffs filed an amended complaint which alleged three likely motives Libya might have had for abducting Ms. Simpson and Dr. Karim.  The amended complaint stated that, in exchange for releasing them, Libya may have wanted: (1) the United States to stop conducting air raids against Libya; (2) revenge for previous U.S. air attacks; and (3) Egypt to return military assets to Libya.  It also referenced Libya's pattern of terrorist activity.  The amended complaint cited newspaper articles, Libya's history of taking and releasing hostages, and a 1997 Department of Defense intelligence report.

Upon Libya's renewed motion to dismiss for lack of subject-matter jurisdiction, personal jurisdiction, and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6), the district court ordered the plaintiffs to provide support for their jurisdictional claim.  The plaintiffs submitted additional materials, including an expert opinion and the State Department's *Patterns of Global Terrorism*, to show that prior and similar acts demonstrated that Libya intended to hold Ms. Simpson and Dr. Karim to trade them for Libyan defectors and military equipment held in Egypt, and/or as human shields against another United States air attack on Libya.  Libya submitted no materials of its own in response, and the district court denied the motion to dismiss.  The district court found that  the plaintiffs had produced sufficient evidence of a *quid pro quo* to support two theories, regarding use of Ms. Simpson and Dr. Karim as human shields and use of Dr. Karim to obtain the return of Libyan defectors and material lost to Egypt, but not as regards Libya's alleged pursuit of retributive justice as that entailed no form of exchange with a third party.  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F.

Supp. 2d 168, 178-80 (D.D.C. 2005).

## II.

On appeal, Libya challenges the legal and evidentiary basis of the hostage taking claim on the ground that the plaintiffs failed to show the essential "intended purpose." *Simpson I*, 326 F.3d at 235 (citing *Price I*, 294 F.3d at 94). The court has jurisdiction of this interlocutory appeal pursuant to 28 U.S.C. § 1291 and the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949). *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (citations omitted). We review the denial of the motion to dismiss for the legal and factual sufficiency of the plaintiffs' claims *de novo. See id.* at 1127 (citing *Price I*, 294 F.3d at 91).

Congress amended the FSIA in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1241-42 (Apr. 24, 1996), adding the so-called "terrorism exception," which denies sovereign immunity in any case "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . hostage taking . . . ." 28 U.S.C. § 1605(a)(7). Section 1605(e)(2) defines "hostage taking" as that term is used in Article I of the International Convention Against the Taking of Hostages ("ICATH" or "Convention"). *See* 28 U.S.C. § 1605(e)(2). As the court recognized in *Simpson I*,

> '[h]ostage taking' occurs under ICATH (and so under FSIA) when a person 'seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage.'

326 F.3d at 234 (quoting Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979)). "The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention." *Id.* at 234-35 (citing *Price I*, 294 F.3d at 94). There must be some "*quid pro quo*" arrangement whereby the hostage would have been released "upon performance or non-performance of any action by that third party." *Price I,* 294 F.3d at 94.

The hostage-taking exception applies only if three additional criteria are also satisfied: [(1)] the foreign state was designated a "state sponsor of terrorism" at the time the act occurred; [(2)] the foreign state was given a reasonable opportunity to arbitrate a claim regarding an act that occurred within the state's borders; and [(3)] the claimant or victim was a national of the United States. 28 U.S.C. § 1605(a)(7)(A), (B). These three criteria are satisfied here, and thus the only question is whether the plaintiffs' claims fall within the main body of the exception. *Kilburn*, 376 F.3d at 1127. Libya bears the burden of "proving that the plaintiffs' allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

**A.**

The legal question raised by Libya is whether third-party awareness of a hostage-taker's intent is a required element of the hostage-taking exception that must be pled as a jurisdictional fact and supported by evidence. Libya contends that the plaintiffs can show intended purpose only where there is "a minimum showing that the third party is at least aware of the possibility that there is a hostage." Appellant's Br. at 15. Libya's contention, however, is wholly unsupported by our case law and the statutory definition of hostage-taking.

In *Simpson I*, 326 F.3d at 234-35, the court looked to the FSIA definition of hostage taking set forth in *Price I*. There, the court emphasized that "[t]he Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention." *Price I*, 294 F.3d at 94. In *Price*, the plaintiffs showed that they were detained to demonstrate the hostage-taker's foreign policy – in that case, Libya's support of Iran's holding of American hostages. *Id*. The court held that plaintiffs did not meet the intentionality requirement. The Convention

> speaks in terms of conditions of release; the defendant must have detained the victim in order to compel some particular result, specifically to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated so as to ensure the freedom of the detainee.

*Id*. Consequently, to show intended purpose, the plaintiff must "suggest[] [a] demand for *quid pro quo* terms between . . . Libya and a third party whereby [the hostages] would have been released." *Id*. The plaintiff must "point[] to [a] nexus between what happened to [the hostages] in Libya and any concrete concession that Libya *may* have hoped to extract from the outside world." *Id*. (emphasis added).

The plain text of the FSIA definition, explanatory commentary on the Convention, and precedent under the Federal Hostage Taking Act ("FHTA"), 18 U.S.C. § 1203, which defines the behavior proscribed in terms identical to the Convention, all reflect that a plaintiff need not allege that the hostage taker had communicated its intended purpose to the outside world. Consistent with the plain text, the court in *Price I* explained that the intentionality requirement focused on the *mens rea* of the hostage taker. 294 F.3d at 94. The commentary, which Libya dismisses without explanation, similarly explains that

"demands" are not required to establish the element of hostage taking: "The words 'in order to compel' do not require more than a motivation on the part of the offender." *See* Joseph J. Lambert, *Terrorism and Hostages in International Law*, 1979, at 306. Case law under the FHTA reflects the same analysis. Where air hijackers prosecuted under the FHTA told their hostages of their intended purpose, evidence that a third party was aware of that purpose was not an essential element for conviction. *United States v. Yunis*, 924 F.2d 1086, 1089-90, 1096-97 (D.C. Cir. 1991); *cf. United States v. Crosby*, 713 F.2d 1066, 1070-71, 1079 (D.C. Cir. 1983) (regarding 18 U.S.C. § 1201(a)(2)). Libya's assertion that these cases are inapplicable because they involve private actors who, unlike a sovereign, have no authority to detain foreigners misses the point. The text of the Terrorism Exception and the commentary make clear that plaintiffs need not demonstrate that a third party was aware of the hostage taking.

It suffices, then, for a plaintiff bringing suit under the FSIA Terrorism Exception to allege a *quid pro quo* as the hostage-taker's intended result from the detention at issue. *See Price I*, 294 F.3d at 94. Such an allegation is legally sufficient to withstand a motion to dismiss, and the law requires no further showing with respect to third-party awareness of the defendant's hostage-taking intent. Here, the plaintiffs have alleged the required *quid pro quo*, and thus their jurisdictional facts are legally sufficient to state a claim under the Terrorism Exception. However, a sovereign defendant disputing FSIA jurisdiction may also contest the jurisdictional facts alleged by the plaintiff. *See Phoenix Consulting*, 216 F.3d at 40. In such cases, the court is obliged to review any determinations of factual sufficiency made by the district court.

**B.**

Libya challenges the competence of plaintiffs' evidence

supporting their allegations of Libya's intended purpose and the district court's failure to resolve an additional factual jurisdiction dispute.

First, Libya maintains that the "hypothetical scenarios" do not constitute either an explicit or an implicit condition for the release of Ms. Simpson or Dr. Karim. It points to the fact that in order to find that the plaintiffs had sufficiently alleged two theories for Libya's possible "intended purposes," the district court relied on the plaintiffs' proffered expert opinion of Mr. Mayer Nudell. According to Libya, Mr. Nudell's affidavit did not direct the district court to any implicit conditions for release, but only to "likely 'scenarios'" and Mr. Nudell never asserted that he had knowledge of the scenarios independent of the materials supplied by the plaintiffs. Libya concludes that such "flimsy grounds" cannot support the exercise of subject matter jurisdiction. Even viewing the evidence most favorably to the plaintiffs, Libya maintains that the amended complaint and Mr. Nudell's hypothetical scenarios do not point to any nexus between what happened to Ms. Simpson and Dr. Karim and any concrete concession that Libya may have hoped to extract from the outside world.

In *Kilburn*, the court noted that, beyond the defendant's ultimate burden of persuasion, other burdens may be placed on the parties when the defendant files a motion to dismiss, 376 F.3d at 1131, although the court has never held that either the plaintiff or the defendant bears the initial burden of production, *id.* The court has been clear, however, that when a plaintiff provides evidentiary support for its allegations, based on the assumption that it has the burden of production, a defendant that chooses to remain silent risks denial of its motion to dismiss. More explicitly, in *Kilburn*, the court stated that Libya, in such circumstances, had "satisfied neither a burden of production nor [its] required burden of persuasion." 376 F.3d at 1132; *cf Price*

*v. Socialist People's Libyan Arab Jamahiriya*, 389 F. 3d 192, 198 (D.C. Cir. 2004) ("*Price II*"). As in *Kilburn*, we assume here that a plaintiff who relies on an exception to the FSIA immunity provisions has an initial burden of production. We hold that the plaintiffs have met their burden.

Based on Mr. Nudell's extensive resume and the fact that courts have previously taken judicial notice of the proffered *Patterns of Global Terrorism* as representing the official position of the United States government, *see Kilburn*, 376 F.3d 1123, the district court did not abuse its discretion in admitting this evidence, *see Kumho Tire v. Carmichael*, 526 U.S. 137, 142 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). Mr. Nudell's opinion was consistent with the requirements of Fed. R. Evid. 703, which does not require independent evidence nor limit an expert to consideration of admissible evidence in forming an opinion.[1] *See Ambrosini v. Labarraque*, 101 F.3d 129, 132 (D.C. Cir. 1996). And as the district court noted on remand, *see Simpson*, 362 F. Supp. 2d at 176 n.5, this court affirmed the denial of a motion to dismiss under Rule 12(b)(1) partially in consideration of the evidentiary weight of State Department and CIA documents in *Kilburn*, 376 F.3d at 1131.

The plaintiffs needed to know why Libya acted as it did, but

---

[1] Fed. R. Evid. 703 provides in pertinent part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

could not compel Libya to explain. Instead, the plaintiffs submitted their jurisdictional filings and put forward their best assessments, based on available information. In that light, it was eminently reasonable for the district court to find sufficient the purposes proffered by the plaintiffs. *See Price II*, 389 F.3d at 197. Although Libya challenges the sufficiency of "hypothetical scenarios," the plaintiffs alleged facts and made offers of proof on every salient fact regarding the possible reasons for Libya's detention of Ms. Simpson and Dr. Karim. Based on the circumstantial evidence in the relevant proffers, *see Holland v. United States*, 348 U.S. 121, 140 (1954), the district court could reasonably draw inferences regarding Libya's state of mind and its intended purposes for detaining Ms. Simpson and Dr. Karim based on the plaintiffs' substantiated theories about Libya's intended purposes.

Second, Libya contends that the district court erred by failing to address all of the disputed jurisdictional facts, specifically ignoring evidence that "highlighted legitimate reasons for [Ms.] Simpson's detention as well as evidence showing that [Ms.] Simpson and [Dr.] Karim were not hostages." The district court resolved all of the disputed facts necessary to rule on Libya's motion to dismiss. *See Kilburn*, 376 F.3d at 1127 (citing *Phoenix Consulting*, 216 F.3d at 39). Libya's reference to an alternative, but not necessarily contradictory, explanation for their detention is not enough to establish that the plaintiffs' allegations do not bring the case within a statutory exception to immunity. Libya may have had more than one reason for their detention. Consequently, as the district court found that the plaintiffs had sufficiently established two purposes unrelated to the Egyptian espionage ring, it would not necessarily follow that the district court was required to address the third possible purpose.

Moreover, Libya is relying on evidence that on its face does

not establish the propositions it claims. The earliest State Department cable that Libya references indicates only that, initially, a source in Tripoli believed that the Carin II party was being investigated in connection with an Egyptian espionage ring. The cable is dated April 1987. Over the next several months, however, various other cables indicate that: Ms. Simpson and Dr. Karim could shed no light on why they were detained; the State Department was considering a diplomatic note to Libya "to protest Ms. Simpson's *unwarranted* detention*"* (emphasis added); and although the Belgian consul general thought he might understand why the Carin II party was being detained, he did not elaborate. Thus, insofar as the cables show, by August 1987, the United States government was no longer relying on the Egyptian espionage ring as an explanation for the detention. Another cable indicates that Ms. Simpson, at least, could have left Libya without her passport in May 1987. However, again, in August 1987, the State Department was concerned about her continued "unwarranted detention." The other evidence cited by Libya describes how the hostages were treated, and is unrelated to whether or not they would have been allowed to depart from Libya had they chosen to do so.

Accordingly, we affirm the denial of Libya's motion to dismiss on grounds of sovereign immunity and we remand the case to the district court for further proceedings.