**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1788

IN THE MATTER OF THE COMPLAINT OF JACKSON CREEK MARINE, LLC, AS OWNER OF THE TUG JACQUELINE A,

> Plaintiff – Appellee,

UNITED STATES OF AMERICA,

> Intervenor,

v.

STATE OF MARYLAND,

> Claimant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Elizabeth W. Hanes, District Judge.  (2:23-cv-00115-EWH-LRL)

Argued:  May 7, 2025                                  Decided:  September 3, 2025

Before WYNN, RICHARDSON, and BERNER, Circuit Judges

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Wynn and Judge Berner joined.

**ARGUED:**  David Harlen Sump, WILLCOX & SAVAGE, P.C., Norfolk, Virginia, for Appellant.  Marissa Marriott Henderson, VENTKER HENDERSON STANCLIFF, PLLC, Norfolk, Virginia, for Appellees.  Sophia Shams, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.  **ON BRIEF:**  Anthony G. Brown, Attorney

General, Linda DeVuono, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Christopher A. Abel, Amelia A. Gilmer, WILLCOX & SAVAGE, P.C., Norfolk, Virginia, for Appellant. David N. Ventker, VENTKER HENDERSON STANCLIFF, PLLC, Norfolk, Virginia; Thomas J. Schoenbaum, JD, PhD, Shefelman Distinguished Professor of Law, UNIVERSITY OF WASHINGTON SCHOOL OF LAW, Seattle, Washington, for Appellee. Brian M. Boynton, Principal Deputy Assistant Attorney General, Charles W. Scarborough, Anne Murphy, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Intervenor.

RICHARDSON, Circuit Judge:

A tugboat accidentally crashed its barge into a Maryland bridge, causing millions of dollars of damage. Under ordinary liability rules, those millions would be put on the tug owner's tab. But an old admiralty law, the Exoneration and Limitation of Liability Act, might cap the tug owner's liability at the value of the vessel and its cargo—considerably less than the damage incurred by Maryland. A boon for the tug owner, a burden for the state fisc.

The tugboat owner brought an action under the Limitation Act. In response, Maryland filed a claim contesting the liability limits under the Act. It now comes before us on an interlocutory appeal from the denial of its motion to dismiss, urging that sovereign immunity prevents applying the Limitation Act to cap its recovery. We disagree. While broad, sovereign immunity does not protect state claimants like Maryland who voluntarily join actions brought by vessel owners under the Limitation Act. We thus affirm the district court and permit this limitation action to proceed below.

## I. BACKGROUND

In an ordinary lawsuit, one or more plaintiffs file a complaint in court against one or more defendants alleging wrongdoing and seeking redress. A limitation action under the Exoneration and Limitation of Liability Act operates differently. *See* 46 U.S.C. § 30501 *et seq.* So to understand the proceedings below, we first summarize how the Limitation Act works.

3

### A.     The Limitation Act

Passed in 1851, the Limitation Act was intended "to provide assistance to American shipowners and thereby place them in a favorable position in the competition for world trade" by limiting the liability of vessel owners for "maritime mishap[s]." *Maryland Cas. v. Cushing*, 347 U.S. 409, 413–14 (1954).[1]  When a vessel inflicts "loss, damage, or injury by collision . . . without the privity or knowledge of the owner," the owner's liability is capped at "the value of the vessel and the pending freight." 46 U.S.C. § 30523(a)–(b).  To effectuate this liability cap, the Limitation Act authorizes vessel owners to "bring a civil action in a district court" to resolve the claims against them in a single proceeding. § 30529.

The Limitation Act was "badly drafted even by the standards of the time." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 447 (2001) (quotation omitted).  It provided only an "outline" of how limitation actions were to work, leaving the "details . . . to be prescribed by judicial authority." *Id.* (quoting *Providence & N.Y. S.S. Co. v. Hill Mfg. Co.*, 109 U.S. 578, 590 (1883)).  So in 1872, the Supreme Court promulgated rules to flesh out how limitation actions worked. *Id.*  The current instantiation of those rules is embodied in Supplemental Rule F of the Federal Rules of Civil Procedure.  Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Suppl. Rule), Rule F.

---

[1] "The power of Congress to legislate upon the subject has been derived both from the power to regulate commerce and from the clause in the Constitution extending the judicial power to 'all cases of admiralty and maritime jurisdiction.'" *Old Dominion S.S. Co. v. Gilmore*, 207 U.S. 398, 404 (1907) (quoting U.S. Const. art. III, § 2).

4

Under the Limitation Act and the procedures established in Rule F, a vessel owner whose vessel has been involved in a collision can bring a limitation action by filing a complaint in district court[2] no later than six months after receiving written notice of a claim. § 30529(a); Suppl. Rule F(1). Along with the complaint, the vessel owner deposits money or securities equal to the value of the vessel and its pending freight with either the court or a trustee. § 30529(b); Suppl. Rule F(1). Once the shipowner has done so, the Act commands that "all claims and proceedings against the owner shall cease." § 30529(c). If necessary, the vessel owner may request the court to enjoin all other actions pending against the owner with respect to the collision. Suppl. Rule F(3). The vessel owner must then directly notify all persons known to possess claims against the owner that the limitation action is occurring; for the remaining unknown potential claimants, the court provides notice by publication. Suppl. Rule F(4). Though notified, persons with claims against the vessel owner are not required to file their claims, as the filing of the limitation action is not itself a lawsuit and does not name them as defendants. A claim may be filed and, if a person "desires to contest . . . the right to limitation of liability," they must file their claim and "serve an answer" to the complaint so contesting. Suppl. Rule F(5).

Armed with this understanding of how limitation actions work, we can turn to the case's facts and procedural history.

---

[2] The rules for selecting an appropriate venue for the limitation action are laid out in Rule F(9). They are irrelevant to this suit.

5

### B.    Factual and Procedural History

In March 2015, a barge pushed by the Tug Jacqueline A allided—nautical terminology for a collision between a ship and a stationary object—with the fendering system on Maryland's Nanticoke River Memorial Bridge.  Following the allision, the tugboat's owner, Jackson Creek Marine, LLC, timely filed a Limitation Act complaint in the Eastern District of Virginia, properly invoking the district court's admiralty jurisdiction.  28 U.S.C. § 1333(1).  The complaint sought to cap Jackson Creek's total liability for the allision at the alleged value of the tug and its cargo at the time:  $900,000.  Jackson Creek also deposited that amount with the district court.  As with all complaints under the Limitation Act, Jackson Creek's complaint does not name a defendant.

Finding that Jackson Creek satisfied the conditions for bringing a limitation action, the district court issued an order staying and restraining all proceedings arising out of the allision.  The order also gave notice that anyone who wished to challenge Jackson Creek's entitlement to limited liability, or the amount of liability, could do so.

Maryland filed to enter Jackson Creek's limitation action as a claimant.  Maryland's claim sought the total estimated damage on its bridge:  $3,140,343.98.  And, as was its right as a claimant under Rule F(5), Maryland also argued that Jackson Creek was not entitled to limited liability under the Limitation Act.  No other parties have filed claims against Jackson Creek.

After entering, Maryland moved to dismiss the limitation action under Rule 12(b)(1), arguing that its sovereign immunity prohibited a court from applying the Limitation Act against it.  The district court found that the "petition for limitation brought

6

under the Limitation Act" was not "a suit against the State of Maryland." *Matter of Jackson Creek Marine, LLC*, 2024 WL 3886785, *3 (E.D. Va. July 19, 2024). The district court reasoned that Jackson Creek "d[id] not seek damages from the state of Maryland and s[ought] only to determine [its] liability and divide the limitation fund equitably among the claimants." *Id.* (quotation omitted). Accordingly, the district court denied Maryland's motion to dismiss based on sovereign immunity.

Maryland then took a timely interlocutory appeal. We have jurisdiction over Maryland's interlocutory appeal because the denial of a state's assertion of sovereign immunity may be immediately appealed under the collateral order doctrine. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993). The United States has intervened on appeal to support Jackson Creek.

## II.    DISCUSSION

This appeal poses a single question: whether Jackson Creek's limitation action infringes on Maryland's sovereign immunity.[3] Before we get to Maryland's contentions, we provide an overview of sovereign immunity.

### A.    Sovereign Immunity Overview

The doctrine of sovereign immunity is easy to grasp and hard to apply. In a line, sovereign immunity is a sovereign's privilege "not to be amenable to the suit of an individual without its consent." *Hans v. Louisiana*, 134 U.S. 1, 13 (1890); *accord* The Federalist No. 81, at 548–49 (Alexander Hamilton) (Jacob E. Cooke ed. 1961). In practice,

---

[3] The district court answered in the negative, and we review its decision *de novo*. *Gibbons v. Gibbs*, 99 F.4th 211, 214 (4th Cir. 2024).

7

"sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). When a sovereign properly asserts its sovereign immunity in a suit, the federal courts lack jurisdiction to proceed any further against it.[4] Simple enough. Now to explain when sovereign immunity can be properly asserted.

Our explanation is not a short one, as might be expected for a topic that has sparked controversy since our nation's infancy. Just a few years after the Constitutional Convention and the Constitution's ratification, the Supreme Court took its first step into the sovereign immunity sphere—and immediately provoked an uproar. In *Chisholm v. Georgia*, the Supreme Court held that a South Carolina citizen could sue Georgia without its consent. 2 U.S. (2 Dall.) 419, 479 (1793). This decision "fell upon the country with a

---

[4] Sovereign immunity is an odd jurisdictional bar. Federal courts must possess two distinct types of jurisdiction to hear a case. The first is subject matter jurisdiction, which goes to the Article III power of the court over the dispute and is "inflexible and without exception." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). For subject matter jurisdiction, "the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." *Id.* The second is personal jurisdiction, which "flows not from Art. III, but from the Due Process Clause" and protects the "individual liberty" of the parties. *Id.* Like other individual rights, an objection to personal jurisdiction "may be intentionally waived, or . . . estopped," and the asserting party must "timely raise[]" the issue "in the answer or a responsive pleading." *Id.* at 703–05.

Sovereign immunity has some of the characteristics of both types of jurisdiction. The sovereign may waive it, like a personal jurisdiction bar. *See PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 500 (2021). But the sovereign may also assert sovereign immunity for the first time on appeal, much like a subject matter jurisdiction bar. *Edelman v. Jordan*, 415 U.S. 651, 678 (1974). So the doctrine is best understood as "somewhat of a hybrid between subject matter and personal jurisdiction." *Va. Dep't of Corrections v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

8

profound shock." *Alden v. Maine*, 527 U.S. 706, 720 (1999) (quoting 1 C. Warren, *The Supreme Court in United States History* 96 (rev. ed. 1926)).  As Justice Iredell presciently noted in dissent, various English jurists had long recognized that a subject of a sovereign ordinarily had "no way to oblige his [sovereign] to give him his due when [the sovereign] refuse[d]." *Chisholm*, 2 U.S. at 442 (Iredell, J., dissenting); *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751–52 (2002) (recounting the "widespread understanding at the time the Constitution was drafted" that the States would retain "immunity from private suits").

*Chisholm* prompted a swift and severe reaction.  Just two years later, the States ratified the Eleventh Amendment, which by its terms "'address[es] the specific provisions of the Constitution that had . . . formed the basis of the *Chisholm* decision.'" *Fed. Mar. Comm'n*, 535 U.S. at 753 (quoting *Alden*, 527 U.S. at 723).  The Eleventh Amendment's text commands:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of *another* State"—the precise facts of *Chisholm*.  U.S. Const. amend. XI (emphasis added).

But later cases confirm that the Eleventh Amendment does not "memorializ[e] the full breadth of the sovereign immunity retained by the States." *Fed. Mar. Comm'n*, 535 U.S. at 753.  Rather, the amendment is "but one particular exemplification of that immunity." *Id*.  That is why a state enjoys sovereign immunity when sued by its own citizens, even though the Eleventh Amendment says nothing about such suits. *See Hans*, 134 U.S. at 14–15 (calling it "almost an absurdity on its face" to imagine that a state could

9

be sued by its own citizens but not by other states' citizens).  To think that the scope of state sovereign immunity "rest[s] on the words of the Amendment alone" is to engage in "ahistorical literalism."  *Alden*, 527 U.S. at 730.[5]

Rather than deriving from the Eleventh Amendment, state sovereign immunity derives "from the structure of the original Constitution itself."  *Id.* at 728.  The states were sovereign before they joined to become the United States, and they "entered the federal system with their sovereignty intact."  *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991).

But "intact" does not mean "unscathed."  Inherent in the Constitution's structure are "certain waivers of sovereign immunity to which all States implicitly consented at the founding" by ratifying the Constitution.  *PennEast Pipeline Co.*, 594 U.S. at 500.  These so-called "plan of the Convention" waivers include waivers to certain suits under federal bankruptcy laws, "suits [brought] by other States," and "suits [brought] by the Federal Government."  *Id.* (collecting cases).[6]  Additionally, Congress is empowered to abrogate state sovereign immunity in limited circumstances pursuant to the power granted by § 5 of

---

[5] The phrase "Eleventh Amendment immunity" is often used—including by the litigants and the district court below—as a "convenient shorthand" for state sovereign immunity.  *Alden*, 527 U.S. at 713.  But the phrase "is something of a misnomer."  *Id.*  Cases that use the phrase "Eleventh Amendment immunity" are generally understood as speaking about state sovereign immunity more broadly.

[6] The Supreme Court has identified three specific constitutional provisions where there was such a waiver:  *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 379 (2006) (U.S. Const. art. I, § 8, cl. 4); *PennEast Pipeline*, 594 U.S. at 508–09 (U.S. Const. amend. V); *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 599 (2022) (U.S. Const. art. I, § 8, cls. 12–13).  The states waived any immunity they might later assert against suits authorized by Congress in the exercise of its power under those clauses by ratifying them.

10

the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Without a valid abrogating power, congressional action, even in an area where Congress has exclusive lawmaking authority, that tries to override state sovereign immunity will fail. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996).

When asking whether a state is shielded by sovereign immunity against a suit, we begin by asking whether the suit implicates sovereign immunity at all. That occurs in two situations. The first is when the suit subjects the state to "the coercive process of judicial tribunals." *P.R. Aqueduct*, 506 U.S. at 146 (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). The second is when the state, even if not subject to coercive process by name, is "the real, substantial party in interest" to the suit. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). If sovereign immunity is implicated in one of these two ways, it still may not shield the state. A state may still waive its immunity, either *ex ante* by the "plan of the Convention" or *ex post* by "unequivocally expressed" consent. *PennEast Pipeline*, 594 U.S. at 500 (quotation omitted). And Congress may still have abrogated state immunity in the area. *See Fitzpatrick*, 427 U.S. at 456. But first things first—waiver and abrogation are irrelevant if sovereign immunity is not implicated in the first place. We start there.

### 1.    When the state is subject to "coercive judicial process"

The classic instance of subjecting a state to coercive judicial process occurs when a plaintiff brings "an adversary action against the state" where the state is "named a defendant" and is "served with process mandating that it appear." *Maryland v. Antonelli Creditors' Liquidating Tr.*, 123 F.3d 777, 786–87 (4th Cir. 1997). In such a case, sovereign

11

immunity will shield the state from being dragged into court against its will. And it matters not which court the state is dragged into. The Supreme Court has "often described the States' immunity in sweeping terms, without reference to whether the suit was prosecuted in state or federal court." *Alden*, 527 U.S. at 745; *see also Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 236 (2019) (overruling *Nevada v. Hall*, 440 U.S. 410 (1979), and holding that "States retain their sovereign immunity from private suits brought in the courts of other States"). The shield "protect[s]" the "dignity and respect afforded a State," and so it applies wherever that dignity is impugned. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997).

But a state's dignity is not impugned whenever it participates in a case in its own name. It is "*coercive* judicial process," not "judicial process" *simpliciter*, that works an indignity. *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004) (emphasis added). So it should be no surprise that state sovereign immunity is not implicated when the state commences the suit. *See, e.g.*, *Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1, 4 (1794) ("The State of Georgia, sues three private persons."); *see also PennEast Pipeline*, 594 U.S. at 517 (Barrett, J., dissenting) (collecting cases). And there are other cases where a state is not the plaintiff, is nevertheless involved in judicial process, and yet is still not coerced. Two exemplar areas are prize recovery and bankruptcy.

In prize recovery cases, potential claimants fight over who gets a shipwreck and whatever cargo—or treasure—the ship was carrying. In such cases, the party that finds a shipwreck will ask a court to settle ownership of the wreck by filing suit "under that court's *in rem* admiralty jurisdiction." *California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 495–96

12

(1998). An *in rem* proceeding is "taken directly against property"—the *res*—"and has for its object the disposition of the property, without reference to the title of individual claimants." *Pennoyer v. Neff*, 95 U.S. 714, 734 (1877). This contrasts with typical *in personam* proceedings, which are taken against "the defendants" to "determine the[ir] personal rights and obligations." *Id.* at 727. Thus, "proceedings *in rem* . . . against property of the [sovereign] are only forbidden in cases where, in order to sustain the proceeding, the possession of the [sovereign] must be invaded under process of the court." *The Davis*, 77 U.S. 15, 20 (1869). Because the plaintiff *sues the vessel* and not the state, the state's sovereign dignity is not infringed upon so long as the suit does not touch its possessions. *See Deep Sea Rsch.*, 523 U.S. at 506–08. This remains true even if the state later intervenes to assert ownership over the vessel that it does not possess. *See id.*

A bankruptcy case similarly does not infringe upon the dignity of a state in the usual case, even though it may bind the state. *Hood*, 541 U.S. at 447–50; *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006) ("As we noted in *Hood*, [bankruptcy] does not implicate States' sovereignty to nearly the same degree as other kinds of jurisdiction."). When a debtor files for bankruptcy in bankruptcy court, "the court's jurisdiction is premised on the debtor and his estate, and not on the creditors." *Hood*, 541 U.S. at 447. The judicial process that occurs then usually culminates in nothing more than the "discharge of [the debtor's] debts." *Id.* at 450. "The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*. It is none the less such because the claim is rejected in toto [or] reduced in part." *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947). In other words, while the discharge of a state-owned

13

loan may impact the state fisc, it does so only as an indirect consequence of a proceeding that is otherwise unconcerned with the state. That does not "interfere with state sovereignty even when States' interests are affected." *Katz*, 546 U.S. at 370.

Thus, the Supreme Court has told us, in the bankruptcy context even a "service of a summons" to a state to adjudicate the discharge of a state-owned loan fails to implicate sovereign immunity. *Hood*, 541 U.S. at 454. Such a summons, when understood against the "the essential nature and effect" of the *in rem* bankruptcy proceeding, is not "coercive" upon the state. *Id*. To be sure, an *in rem* bankruptcy proceeding does not "override[] sovereign immunity" in all circumstances. *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 38 (1992). When the bankruptcy trustee sues a sovereign directly to recover money from an unauthorized transfer to the sovereign's treasury, for example, the essential nature of such a suit is sufficiently coercive to implicate sovereign immunity. *See id.* at 31, 38 (in the context of federal sovereign immunity); *see also Hood*, 541 U.S. at 452–53. So some exercises of the bankruptcy court's judicial authority are still "an affront to the sovereignty of the State." *Hood*, 541 U.S. at 451 n.5. But in the ordinary case where the bankruptcy court "exercise[s] . . . its *in rem* jurisdiction to discharge a debt," that discharge is not coercive on the creditor, even when the creditor is a state. *Id.* at 448.

Sovereign immunity is straightforwardly implicated when a state is sued by name. A state's mere involvement in judicial process in its own name, however, may occur without any coercion, and sovereign immunity is silent in those circumstances. Now to consider the other side of the coin—when the state is not involved by name, yet sovereign immunity is implicated anyway.

14

### 2.    When the state is the "real party in interest"

Sovereign immunity's shield would be a thin façade if plaintiffs could circumvent its protection by simply swapping the sovereign's name for an entity or official of the sovereign on the complaint. "The real interests served by" sovereign immunity "are not" just tied to "elementary mechanics of captions and pleading." *Coeur d'Alene*, 521 U.S. at 270. That is why "in the context of lawsuits against state and federal employees or entities, courts should look to whether the sovereign is the *real party in interest* to determine whether sovereign immunity bars the suit." *Lewis v. Clarke*, 581 U.S. 155, 161–62 (2017) (emphasis added). If the state is the "real party in interest," then the plaintiff's suit "is truly against the sovereign" and the entity or official "is entitled to invoke" sovereign immunity as if it were the sovereign itself. *Id.* Whether the sovereign is the "real party in interest" differs between suits against state entities and state officials, so we address them separately.

First, state entities. One "important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities." *Alden*, 527 U.S. at 756. Municipalities and other independent governmental entities do not partake in the sovereign's immunity. *Id.*; *e.g.*, *Workman v. City of New York*, 179 U.S. 552, 570 (1900) (cities are not entitled to sovereign immunity); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81 (1977) (school boards are not); *N. Ins. Co. v. Chatham County*, 547 U.S. 189, 196 (2006) (counties are not). Only those entities considered to be "an arm of the State" may invoke sovereign immunity. *Alden*, 527 U.S. at 756.

Whether a state entity "should be treated as an arm of the State" depends on "the relationship between the State and the entity in question." *Regents of the Univ. of Cal. v.*

15

*Doe*, 519 U.S. 425, 429–30 (1997) (quotation omitted). Defining the relationship is more art than science but is primarily characterized by two features: one of the entity itself, and one of the legal proceeding. *See id.* at 430. When "the nature of the entity created by state law" is one that exercises substantial independent power, such as the ability to "issue bonds" and "levy taxes" without strict supervision, the entity "is more like a county or city" and less "like an arm of the state." *Mt. Healthy*, 429 U.S. at 280. And when an "adverse judgment" in the proceeding would subject the state itself to "legal liability," the entity is more like an arm of the state—regardless of "who will ultimately pick up the tab," if there is one. *Lewis*, 581 U.S. at 165. The inverse for each feature is true too. So when the state entity is sufficiently dependent on and answerable to the state, the state will be the real party in interest, and the entity will be shielded by sovereign immunity.

State officials are subject to a more complex standard. To begin with, only certain suits against certain officials can even raise the specter of sovereign immunity. Officials can be sued in either their official capacity or their individual capacity. An official-capacity suit "in fact is against the official's office," which is why "when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation." *Id.* at 162. On the other hand, an individual-capacity suit, also known as a "personal-capacity" suit, "seek[s] to impose individual liability upon a government officer," with any judgment or personal damages to be applied to the officer or the officer's wallet. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Sovereign immunity only ever comes into question with an official-capacity suit, and only when the office is part of the state or an arm of the state. "Since official-capacity suits generally represent only another way of

16

pleading an action against an entity of which an officer is an agent," the official will not partake of sovereign immunity if the entity that employs the official does not. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Sovereign immunity is not implicated outside of official-capacity suits against officials of the state.

Naturally, one might expect that all suits within that universe *would* implicate sovereign immunity. If an official-capacity suit is against the entity that employs the official, and the official is employed directly by the state, then the suit should be against the state as the real party in interest. And yet one specific type of suit is not: A suit that "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation omitted). This is the doctrine of *Ex parte Young*.[7] In such suits, "sovereign immunity does not apply because an official who acts unconstitutionally"—or otherwise violates federal law—"is 'stripped of his official or representative character.'" *Pennhurst*, 465 U.S. at 104 (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). In such circumstances, the state official is no longer considered an official of the state.[8]

This "authority-stripping theory of *Young,*" the Supreme Court has recognized, "is a fiction." *Id.* at 114 n.25. The legal fiction is most obvious when the state official is alleged to have violated the Constitution. The Constitution is concerned with state action,

---

[7] For further discussion, *see* James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269 (2020).

[8] Arms of the state are always arms of the state. The doctrine of *Ex parte Young* "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct*, 506 U.S. at 146.

not private action.[9] *Lindke v. Freed*, 601 U.S. 187, 193 (2024). To allege a cognizable constitutional violation in the first place, then, the official's actions must be the state's actions. So under *Ex parte Young*, the official must both be a state actor for constitutional purposes and not be a state actor for sovereign immunity purposes—a "well-recognized irony." *Pennhurst*, 465 U.S. at 105 (quotation omitted). Yet the *Young* doctrine is well-accepted. *Id.* So official-capacity suits seeking prospective relief for federal-law violations do not implicate sovereign immunity, but all other official-capacity suits do.

Sovereign immunity is thus implicated by official-capacity suits against state officials that seek prospective relief for reasons other than a violation of federal law. Because *Ex parte Young*'s exception to state sovereign immunity serves to "vindicate the supreme authority of *federal* law," it does not create an exception when "a plaintiff alleges that a state official has violated *state* law." *Pennhurst*, 465 U.S. at 106 (emphasis added); *see also id.* ("In such a case the entire basis for the doctrine of *Young* . . . disappears.").

For the same reason, sovereign immunity is implicated by suits against state officials that seek prospective relief and allege no violation of law at all. A federal interpleader action, for example, may attempt to name and hale a state tax official into court to settle a decedent's estate. Such a suit would "not [be] founded on the asserted unconstitutionality of any state statute and the consequent want of lawful authority." *Worcester Cnty. Tr. Co. v. Riley*, 302 U.S. 292, 300 (1937). With no federal law to vindicate in such an interpleader

---

[9] The Thirteenth Amendment is the notable exception. *See City of Memphis v. Greene*, 451 U.S. 100, 120 (1981).

action, there is no reason to deviate from the general rule of sovereign immunity in official-capacity suits. *See Cory v. White*, 457 U.S. 85, 91 (1982).

And finally, because *Ex parte Young* applies only to a subset of suits seeking *prospective* relief, sovereign immunity is implicated by all suits against state officials that seek relief that is *retrospective*. Chief among these are suits that are "in essence . . . for the recovery of money from the state." *Edelman*, 415 U.S. at 663. That includes all suits that seek damages from the state. *Id.* at 668–69. And it includes all similar suits that seek "to impose a liability which must be paid from public funds in the state treasury." *Id.* So a suit seeking "equitable restitution," requiring a state official to disburse federally regulated welfare benefits, does not escape sovereign immunity by its equitable label. *See id.* at 656, 666–67. When the relief sought is effectively "compensation" for "a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials," the suit implicates sovereign immunity. *Id.* at 668.

In sum, sovereign immunity is implicated across a wide swath of suits when the sovereign is not sued in its own name. Apart from suits against municipality-like entities and suits under *Ex parte Young*, the state will be the "real party in interest" when a suit is brought against a state entity or state official. *Lewis*, 581 U.S. at 161. But, as mentioned before, sovereign immunity does not apply just because it is implicated. A state may voluntarily waive its protections in multiple ways. And Congress may, in limited circumstances, forcibly abrogate a state's immunity. But we need not wade into the weeds of waiver and abrogation. This case begins and ends with implication—or the lack thereof.

19

**B.     Sovereign Immunity Is Not Implicated In This Limitation Action**

With a detailed map of which suits implicate sovereign immunity and which do not, we may now situate the limitation action filed by Jackson Creek. Recall that Jackson Creek filed a complaint in admiralty under the Limitation Act to have a federal court declare its total liability for its tugboat's allision with a Maryland bridge. Its complaint names no defendants and focuses solely on the vessel. Maryland then chose—but was not forced—to file a claim in the limitation action, and further chose to contest the application of the liability cap. And if Maryland fails and Jackson Creek's limitation action succeeds, no money will be drained from Maryland's coffers. Its recovery will simply be less than it would have been otherwise.

As should be clear from this quick recap, Jackson Creek's limitation action does not implicate Maryland's sovereign immunity. For starters, the state of Maryland joined this suit in its own name. There is thus no need to ask whether Maryland is the "real party in interest." *Lewis*, 581 U.S. at 162. That second path to implicating sovereign immunity is relevant only when the state is *not* involved in the proceeding in its own name. *See id.* at 161–62 (applying the "real party in interest" analysis "in the context of lawsuits against state and federal *employees or entities*" (emphasis added)). Such cases raise the worry that sovereign immunity is being circumvented through the "characterization of the parties" by simply swapping the state's name for another's. *Id.* at 162. But no such worry is present here.

So the only question is whether this limitation action subjects Maryland to coercive judicial process as a claimant. Of course, Maryland is now embroiled in the judicial

process of this suit after filing a claim in its own name. But it is so embroiled of its own accord. Thus while Maryland is subject to judicial process, that process is not *coercive*.

Indeed, a limitation action appears identical in all legally relevant aspects to the usual bankruptcy case, which we know does not implicate a state's sovereign immunity. *See Hood*, 541 U.S. at 445–47. In the usual bankruptcy case, a "debtor files a petition for bankruptcy," and "the [bankruptcy] court's jurisdiction is premised on the res," which is "the debtor and his estate." *Id.* at 447–48. After the bankruptcy petition is docketed, the "court clerk notifies the debtor's creditors of the order for relief." *Id.* at 447 (citing Fed. R. Bankr. P. 2002(*l*)). Then, "if a creditor wishes to participate" in the bankruptcy proceeding, "he files a proof of claim." *Id.* (citing Fed. R. Bankr. P. 3002(a)). And even though some creditors may fail to recover in full when the value of the debt exceeds the value of the bankruptcy estate, a "discharge order" is issued at the end of the proceeding that "releases [the] debtor from personal liability with respect to any discharged debt." *Id.* (citing 11 U.S.C. §§ 524(a)(1), (2)).

Likewise, a limitation action begins with a vessel owner filing a complaint in admiralty, and "[t]he jurisdiction of the admiralty court attaches . . . by reason of the custody of the res put by the petitioner into its hands." *Hartford Acc. & Indem. Co. of Hartford v. S. Pac. Co.*, 273 U.S. 207, 217 (1927). After the limitation action is deemed proper, the court "shall issue a notice to all persons asserting claims with respect to which

21

the complaint seeks limitation."[10]  Suppl. Rule F(4).  Then, if a party wishes to become a claimant in the suit, it could file a claim "specify[ing] the facts upon which the claimant relies in support of the claim."  Suppl. Rule F(5).[11]  And although some claimants may fail to recover in full when the value of the vessel and cargo is "insufficient to pay all claims," the claimants will be "paid in proportion to their respective losses" if the limitation action is successful, § 30525, and the vessel owner will be released from all remaining liability, *see* § 30529(c).

We disagree with Maryland's efforts to distinguish limitation actions from bankruptcy proceedings.  Maryland first counters that its sovereign immunity *was* implicated because the threat of losing millions in recovery coerced it into filing a claim and contesting Jackson Creek's $900,000 liability cap.  The State further protests that the Limitation Act "compel[s] an otherwise unwilling party promptly to bring its claim into a litigation action by virtue of the threat of default, while enjoining that same party from

---

[10] Maryland argues that it received notice, and that the notice "effectively constitutes service."  Appellant's Br. at 22.  This erroneously blends notice and service, which are two distinct concepts.  Litigants have a procedural due process right to proper notice.  *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  Service may provide notice, but notice is not itself service, which effectuates the further step of haling an individual into court.

[11] Maryland argues that Rule F(5) is invalid because it violates the Rules Enabling Act.  Appellant's Br. at 26 (citing 28 U.S.C. § 2072(b) *and Sibbach v. Wilson & Co.*, 312 U.S. 1, 9–10 (1941)).  Maryland's theory is that it establishes a substantive right not found in the Limitation Act:  compelling appearance in the limitation action under penalty of default.  Appellant's Br. at 25.  But Maryland's interlocutory appeal is constrained to the question of sovereign immunity.  *See Swint v. Chambers Cty. Com'n*, 514 U.S. 35, 51 (1995); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1133 (D.C. Cir. 2004) (applying *Swint* to interlocutory appeals about sovereign immunity).  So we do not address the validity of Rule F(5).

22

pursuing its claim anywhere else." Appellant's Br. at 14 (citations omitted). Maryland stands to lose millions in this limitation action, which is presently its only avenue for recovery. *See* § 30529(c). But the monetary pressure it faces, while great, is no more than a state creditor faces in a bankruptcy where there is the same possibility of recovering substantially less than is owed—or none at all, if no claim is filed.[12] So Maryland's arguments give us no reason to distinguish between the two proceedings. As we have explained, while "forcing a state to make" the choice to join a suit or forfeit legal entitlement to money "may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of" its sovereign immunity. *Antonelli Creditors'*, 123 F.3d at 787.

Maryland then directly attacks the comparison to bankruptcy by pointing out that the Bankruptcy Clause in the Constitution "abrogate[ed] State sovereign immunity,"[13] and no such equivalent exists for the Limitation Act. Appellant's Br. at 22–23 (citing *Katz*, 546 U.S. at 379). This argument conceptually jumps the gun. Abrogation and waiver are

---

[12] Indeed, Maryland is subject to *less* coercive process than was present in *Hood* itself. As mentioned above, in *Hood*, Tennessee was issued a "summons" requiring it to participate in the debtor's "undue hardship determination" that would help the bankruptcy court decide whether to discharge the debtor's student loans. *Hood*, 541 U.S. at 454. Yet that was still not enough to implicate Tennessee's sovereign immunity. Nothing akin to that direct summons is present here.

[13] Maryland, following *Katz*, 546 U.S. 379, uses the term "abrogation" to speak of the sovereign immunity ceded by states to the federal government in the structure of the Constitution. But the Supreme Court has more recently clarified that "abrogation" should be reserved for congressional abrogation under § 5 of the Fourteenth Amendment, and that the Bankruptcy Clause and other agreements baked into structure of the Constitution are better termed "plan of the Convention" waivers. *PennEast Pipeline*, 594 U.S. at 501.

23

ways that sovereign immunity, *once implicated*, still may not shield the state. But they are logically downstream of the implication inquiry. With no sovereign immunity in play in a limitation action, there can be nothing to waive or abrogate.

To be sure, Maryland is correct that the Bankruptcy Clause gives Congress the ability to pass federal bankruptcy statutes that states then cannot shield against. *See Katz*, 546 U.S. at 378. But *Katz* itself explains why the Bankruptcy Clause is irrelevant here. *Katz* begins by expressly reaffirming *Hood. Id.* at 364. It reiterates that although "States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order," that binding discharge order "*does not implicate States' sovereignty.*" *Id.* at 364, 362 (emphasis added). And because "the [bankruptcy] court's jurisdiction is premised on the debtor and his estate . . . its exercise does not, in the usual case, interfere with state sovereignty even when States' interests are affected." *Id.* at 370.

But certain bankruptcy statutes permit the bankruptcy court to go further than a discharge order. A bankruptcy court, "to recover the subject of [an avoided] transfer" may issue "[a] court order mandating turnover of the property," which "might itself involve *in personam* process." *Id.* at 371–72. The *Katz* Court thus addressed orders for property transfers that might implicate sovereign immunity *in a way that the proceeding in* Hood *did not. See id.* at 371 ("[B]ecause the proceeding [in *Hood*] was merely ancillary to the Bankruptcy Court's exercise of its *in rem* jurisdiction, we held that it did not implicate state sovereign immunity."). *Katz* asserted that even if "orders directing turnover of preferential transfers" under certain bankruptcy statutes "implicate States' sovereign immunity from suit, the States agreed in the plan of the Convention not to assert that immunity." *Id.* at

24

373. All relevance of abrogation or waiver in *Katz* sat logically downstream of an assumption that sovereign immunity was implicated in the first place.

Since Maryland complains only of the equivalent of a standard bankruptcy discharge order and not of any special actions taken directly against it, this suit is governed by *Hood*, not *Katz*. As in *Hood*, in this suit "an unwilling State" was not "subject[ed]" "to a coercive judicial process." *Hood*, 541 U.S. at 450. And though Maryland's "interests are affected" by this limitation action, the suit does not otherwise "interfere with [its] state sovereignty." *Katz*, 546 U.S. at 370. Thus like in *Hood*, the Bankruptcy Clause—and waiver and abrogation—are irrelevant. At most, Maryland felt financially pressured to file a claim. But that is not sufficient to implicate its sovereign immunity.

In so concluding, we join two sister circuits who have both concluded that sovereign immunity is not implicated when the state files a claim in a limitation action. *See Magnolia Marine Transp. Co. v. Oklahoma*, 366 F.3d 1153, 1158 (10th Cir. 2004); *Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1349 (11th Cir. 1998). We agree with the Tenth Circuit that in a limitation proceeding, "neither the state, nor its agency, nor its officer is a defendant," and thus the suit is not "against the State" in any coercive sense. *Magnolia Marine*, 366 F.3d at 1157. And we agree with the Eleventh Circuit that a limitation action "is sufficiently analogous" to an *in rem* prize recovery case to infer that sovereign immunity is also not implicated, *Bouchard*, 147 F.3d at 1349—though we add, with the

benefit of the Supreme Court's later decision in *Hood*, that bankruptcy is perhaps a closer comparison.[14]

\*          \*          \*

A barge towed by the Tug Jacqueline A allided with the fendering system on Maryland's Nanticoke River Memorial Bridge. The owner of the tug, Jackson Creek, filed a complaint under the Limitation Act, seeking to cap its liability to the value of the tug and its cargo—a sum substantially less than the damage to the bridge. Maryland, potentially over $2 million in the red from the accident, filed a claim in that limitation action and sought to contest the liability cap. But the limitation action did not coerce Maryland into entering the judicial process by name or otherwise. So the suit did not implicate Maryland's sovereign immunity. The district court decision must therefore be affirmed, and this limitation action may proceed below.

*AFFIRMED.*

---

[14] The prize recovery cases are quite close as it is. As was the case in *Bouchard*, 147 F.3d at 1349, there is no reason to think that the "process of the court" in this limitation action "invade[s]" any of Maryland's possessions—something that the prize recovery cases suggest may be sufficient to impugn the dignity of the state. *Deep Sea Rsch.*, 523 U.S. at 507. So *Deep Sea Research* would be sufficiently apt to apply here too.

26